859 So.2d 671 (2003)
In re Lawrence David SLEDGE.
No. 2003-B-1148.
Supreme Court of Louisiana.
October 21, 2003.
Rehearing Denied December 12, 2003.
*672 Charles B. Plattsmier, Chief Disciplinary Counsel, Bernadine Johnson, Deputy Disciplinary Counsel, Counsel for Applicant.
*673 Leslie J. Schiff, Opelousas, L.D. Sledge, East Baton Rouge, Counsel for Respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
This disciplinary matter involves four counts of formal charges, instituted by the Office of Disciplinary Counsel ("ODC") against respondent, Lawrence D. Sledge, an attorney licensed to practice law in the State of Louisiana.[1]

UNDERLYING FACTS

Count IChinn Matter
In 1995, Robert and Helania Chinn retained respondent to institute a personal injury suit against the Iberville Parish Police Jury. Respondent timely filed suit on behalf of his clients in September 1996, but withheld service on the defendant for over one year. The defendant filed a motion to dismiss, on the ground that service was not requested within ninety days, as required by La. R.S. 13:5107 D. After a contradictory hearing, the case was dismissed without prejudice.
Respondent spoke to Mrs. Chinn only once after the case had been dismissed by the trial court. At that time, he advised her he could win the case on appeal.[2] The ODC alleges respondent failed to advise his clients of their potential legal malpractice action against him, although respondent disputes this allegation.[3]
The ODC contends respondent's actions violate Rules 1.1(a) (incompetence), 1.2(a) (scope of representation), 1.3 (lack of diligence), 3.2 (failure to expedite litigation) and 8.4(a) (violating or attempting to violate the Rules of Professional Conduct).

Count IISolicitation
Prior to 1998, respondent periodically paid money to current and former clients for referring prospective clients to him.[4] In particular, respondent's financial records indicate he paid money for client referrals to Nat Wilson, Ruby Moore and Terry Washington. Further, respondent concedes that "from time to time," he also gave money "for something or other"[5] to Ora Moore and Barbara Wilson, who he alleges also referred clients. Respondent *674 stopped the practice of paying clients for referrals after the complaint subject of these proceedings was instituted against him with the ODC.

Counts III & IVFailure to Supervise Non-Attorney Staff & Assisting in the Unauthorized Practice of Law
Respondent operates his high volume personal injury practice as a solo practitioner. In addition to employing a receptionist, one or two law clerks and a bookkeeper, respondent employed two nonlawyers, Lil Lalumandier and Wendy LeBleau, as his office manager/litigation supervisor and his legal assistant, respectively.
The record indicates that respondent's staff broadly characterized cases as nonlitigation matters, which could be settled without the necessity of filing petitions, and litigation matters, which required the filing of petitions.
As to the litigation matters, all petitions and other pleadings were drafted by various non-attorney employees, who utilized general pleading forms. At times, the staff used a rubber stamp with respondent's signature to sign discovery pleadings and correspondence. At other times, the staff members signed respondent's name to the other pleadings, even if he was present in the office. In most instances, respondent did not review the pleadings or correspondence that left his office. By all accounts, respondent simply participated in depositions and made court appearances.
Non-litigation matters ordinarily went to Ms. LeBleau, who would oversee the clients' medical treatment, verify insurance, correspond with insurance adjusters and prepare demand letters seeking sums based on guidelines used in all cases.[6] Following her preparation of a demand letter, she would direct the matter to Ms. Lalumandier, who would negotiate and settle the matter directly with the insurance carrier's adjuster. The record indicates that at no point during the process did respondent directly supervise or review the work of his staff, and in most cases, respondent had not even met the client his firm was representing.[7]
On a weekly basis, respondent was provided a graph reflecting the cases settled and the amount of income he generated from these settlements. According to Ms. Lalumandier, during her nine years with respondent, she settled approximately 500 cases, with many being in the range of $150,000 and the highest settlement being in excess of $162,000.
During the period from 1996 through 1998, respondent was absent from his office for several months at a time.[8] During *675 these long absences, respondent's staff was left unsupervised to operate the office on a daily basis. They continued to interview and sign up clients, prepare and file pleadings, negotiate non-litigation settlements and issue checks under the guidance of Ms. Lalumandier. Respondent would periodically check in with his staff by telephone. He also advised them, in the event they had a legal question, they could speak to Randall Shipp, an attorney who leased space from respondent, but had no formal connection with respondent. According to respondent, he learned of the extent of the neglect of his practice by his office personnel in 1998, when he reviewed the graphs generated by his staff and detected a decrease in his income.

DISCIPLINARY PROCEEDINGS

Complaint
In January 1999, Ms. LeBleau, respondent's former legal assistant, filed a disciplinary complaint addressing the misconduct which took place during the last years of her twelve-year tenure with respondent's law firm. Respondent filed several responses to the complaint denying any misconduct on his part. He blamed the dismissal in the Chinn case, his decrease in revenues and the neglect of legal matters on his office staff. In doing so, respondent admitted he had failed to properly supervise the operation of his office and staff.[9]

*676 Formal Charges

After investigation, the ODC filed four counts of formal charges against respondent alleging violations of Rules 1.1(a) (incompetence), 1.2(a) (scope of representation), 1.3 (lack of diligence), 1.4 (failure to communicate), 1.8(e) (offering of financial assistance to client in connection with litigation), 3.2 (failure to expedite litigation), 5.3 (failure to properly supervise non-lawyer assistants), 5.5(b) (assist a nonmember of the bar in the unauthorized practice of law), 7.2(a) (solicitation of employment), 7.2(d) (remuneration to person recommending lawyer's services), 8.4(a) (violating or attempting to violate the Rules of Professional Conduct) and 8.4(d) (engaging in conduct prejudicial to the administration of justice).[10]
Respondent filed an answer to the formal charges. His statements paralleled in part and contradicted in part his earlier responses to the complaint. As to the Chinn matter, respondent denied any professional misconduct alleging his actions simply constituted malpractice and that he assumed his clients abandoned their claim since they did not contact him again. Regarding the client solicitation, respondent stated there were isolated instances of his showing his appreciation to clients for referrals, and that it was not a systematic way of his obtaining business. As to the failure to supervise charges, respondent denied his office staff was completely unsupervised in his absences, noting he would periodically call the office to check in and Mr. Shipp, who leased office space from him, was available to answer any questions. Contrary to his responses to the complaint, respondent contended he "never neglected a client," and that his "cases were carried through to proper and happy results in every circumstance" with no delay or harm resulting from the alleged problems he had with his staff.
The case then proceeded to a formal hearing, at which time the ODC presented several witnesses, including Ms. Lalumandier and Ms. LeBleau. Respondent appeared at the hearing and testified on his own behalf.

Recommendation of the Hearing Committee
At the conclusion of the hearing, the committee rendered a lengthy report outlining in detail the testimony of each witness. Finding the testimony of the ODC's witnesses to be reliable, the committee found clear and convincing evidence of violations of Rules 1.3, 1.4, 1.8(e), 5.3, 5.5(b), 7.2(d) and 8.4(a) of the Rules of Professional Conduct.[11] Specifically, as to Count I relative to the Chinn matter, the committee determined respondent notified his clients of the dismissal, but did not adequately notify them of their rights to proceed against him. Regarding Count II, the ODC found respondent paid his clients, Nat Wilson, Ora Moore, Ruby Moore and Terry Washington, for referring clients to him. It further acknowledged respondent admitted that Barbara Wilson, Nat Wilson and Ora Moore had referred clients and that he had from time to time given them "money or something or other." As to Count III, the committee concluded respondent permitted his non-attorney office manager, Ms. Lalumandier, to engage in the unauthorized practice of law since he *677 allowed her to "sign up new clients, negotiate settlements, including exercising the discretion and making decisions and recommendations to clients without supervision from an attorney, conduct discovery, sign pleadings, manage the financial aspect of the office and gain control of the office and the employees without properly supervising either the office manager or the staff." Finally, regarding Count IV, the committee determined respondent failed to supervise the activities of Ms. LeBleau with regard to the administration of nonlitigation matters, resulting in the neglect and poor condition of respondent's files and lack of communication with his clients.
Addressing the issue of sanctions, the committee considered in aggravation respondent's substantial experience in the practice of law,[12] the actual injury to the Chinns, respondent's systematic knowing and paying for client referrals, and the knowing and systematic unauthorized practice of law by a non-lawyer staff member. In mitigation, the committee relied on respondent's lack of prior disciplinary record, emotional problems, and the acceptance of responsibility for his actions. Applying these factors, coupled with the ABA's Standards for Imposing Lawyer Sanctions, the committee determined respondent's actions were knowing and intentional. While it recognized his actions caused no serious harm to a client, the public, or the profession, it concluded that respondent's payments for the referral of clients warrants a baseline sanction of suspension.
Accordingly, the committee recommended respondent be publicly reprimanded and suspended from the practice of law for a period of one year, with all but sixty days deferred, subject to a two-year conditional period of probation.
Both parties filed an objection to the recommendation of the hearing committee.

Recommendation of the Disciplinary Board
As to Count I, the board rejected the factual findings of the committee and accepted respondent's testimony that he adequately notified the Chinns of their rights to proceed against him through his malpractice carrier. In support, it relied on respondent's testimony that he notified his insurance carrier of the matter and that, two months prior to the hearing, he received a telephone call from the carrier that it considered the claim to be preempted due to the clients' failure to take any action against him. It found respondent's misconduct constituted potential malpractice, rather than an ethical violation. Accordingly, it determined the committee erred in finding a violation of Rules 1.3 and 8.4(a) relative to incompetence and violating the professional rules as a whole.
Likewise, the board found as to Count II, the hearing committee erred in its determination that respondent gave money to Ms. Moore and Ms. Wilson for the referral of clients. Nonetheless, the board concurred in the committee's legal findings that respondent violated Rules 1.8(e), 7.2(d) and 8.4(a) insofar as he provided financial assistance, other than living expenses, court costs and litigation expenses, to other clients, and gave money to clients for recommending his services to others. Also, unlike the hearing committee, the board concluded respondent violated Rule 7.2(a), reasoning, although there is no evidence respondent actively solicited the cases through Ms. Moore, Mr. Wilson and *678 Mr. Washington, he ratified their actions when he paid them after the referral was made.
Finally, as to Counts III and IV, the board found no clear and convincing evidence that respondent assisted his employees in the unauthorized practice of law or failed to supervise his employees' actions. The board rejected the hearing committee's reliance on the testimony of Ms. Lalumandier and Ms. LeBleau, finding there was insufficient documentary evidence to corroborate this testimony. Instead, the board accepted the respondent's assertions that, while out of the office, he remained in telephone contact with his staff and relied on Mr. Shipp to sign pleadings. The board accepted respondent's testimony that he never authorized any signing of pleadings with the rubber stamp, and never allowed Ms. Lalumandier to negotiate settlements in non-litigation matters. While the board agreed there was evidence of neglect of legal matters and a failure to communicate with clients, it determined there was insufficient evidence to determine whether this conduct resulted from respondent's lack of supervision, reasoning the office manual should have aided the staff in maintaining orderly files. Accordingly, the board determined the committee erred in finding violations of Rules 5.3 and 5.5(b) relative to failure to supervise and assisting in the unauthorized practice of law, respectively.
The board recognized respondent's solicitation misconduct to be knowing and intentional, and his neglect of legal matters and failure to communicate to be negligent. It recognized there was little, if any harm, to his clients since no clients complained of any harm. Notwithstanding, the board found his "payment of referral fees to his client undermines the reputation of lawyers generally and the public's attitude toward the profession." As aggravating factors, the board considered substantial experience in the practice of law. In mitigation, it recognized the absence of a prior disciplinary record, absence of a dishonest or selfish motive and personal or emotional problems. Relying on these factors and jurisprudence from this court, the board recommended respondent be suspended from the practice of law for a period of one year and one day, with all but ninety days deferred.
One board member concurred and dissented in part stating he agreed with the board's legal findings and the recommended sanction. However, he expressed concern that the board ignored the factual findings of the hearing committee in the absence of manifest error, noting the testimony of the ODC's witnesses was corroborated by the testimony of respondent as to the charges of neglect of legal matters and failure to communicate.
The ODC filed an objection to the board's substitution of the committee's factual findings, as well as the board's legal findings and the leniency of the proposed sanction. As such, the matter was docketed for briefing and argument in accordance with Supreme Court Rule XIX, § 11(G).

DISCUSSION

Standard of Review
Pursuant to Supreme Court Rule XIX, § 11(F)(2), the hearing committee acts as the initial trier of fact and the board serves an appellate review function. In interpreting this provision, we have held the disciplinary board is bound by the manifest error standard when it reviews the factual findings of the hearing committee. In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150. As developed in civil cases, the manifest *679 error standard requires the reviewing court to determine not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Stobart v. State Through Department of Transportation and Development, 617 So.2d 880 (La.1993).
In a bar disciplinary case, we are not bound by the findings of the hearing committee or disciplinary board. Rather, pursuant to the grant of the original jurisdiction contained in La. Const. art. V, § 5(B), we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proved by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343. Nonetheless, in cases involving credibility evaluations, we generally defer to the factual findings of the hearing committee members who act as the eyes and ears of this court. In re: Bolton, 02-0257 (La.6/21/02), 820 So.2d 548.
Applying this standard of review, we now examine the record to determine whether the hearing committee's factual findings are supported.

Analysis of the Record
Although a total of ten witnesses testified at the hearing, the critical testimony came from Ms. Lalumandier, Ms. LeBleau and respondent. Accordingly, we will summarize the testimony of these witnesses.

1. Testimony of Lil Lalumandier
Ms. Lalumandier testified she had over twenty years of experience as a legal assistant when she went to work for respondent. She stated she was initially only responsible for the supervision of the law clerks and the drafting of pleadings. Ms. Lalumandier maintained she ultimately became office manager in 1995, making her responsible for all financial, business and personnel affairs, while she also ran the litigation and non-litigation sections of the firm. She asserted respondent's basic function was to bring in new business into the office, attend depositions and occasionally try cases. Ms. Lalumandier testified, during respondent's absences from the office, she had full responsibility for every aspect of the practicei.e., personnel and financial matters, case acquisition, management and settlements. She alleged the office operated in the same manner as it was conducted when respondent was present.
With regard to litigation files, Ms. Lalumandier indicated respondent would not have anything to do with a file unless he had to make an appearance. She alleged, during the last three years of her employment with respondent, he did not see petitions before they were filed, and that all discovery was stamped by other persons. She noted that Ms. LeBleau would execute anything that needed to be signed in original since her signature was closest to that of respondent. Ms. Lalumandier testified they went to great lengths to settle cases so petitions would not have to be filed, which she claims they successfully accomplished from 1995 to 1998 since respondent had only ten trials in that time.
As to the non-litigation matters, Ms. Lalumandier corroborated Ms. LeBleau's testimony that respondent had absolutely nothing to do with the files, and would be irritated if he were consulted on such.[13] *680 She testified that she never requested Mr. Shipp's assistance on any non-litigation files, but occasionally asked that he cover a deposition or court appearance that could not be rescheduled in respondent's absence.[14] She stated she was responsible for all settlement negotiations with the insurance carriers and their attorneys and that, when she deemed acceptable settlement terms were reached, she would contact the client and get the client's approval of the settlement. Ms. Lalumandier testified that the adjusters knew she was not a lawyer and that she, in her own mind, did not feel that she was practicing law. Regarding the parameters for settling litigation cases, Ms. Lalumandier maintained that she did all of her own quantum research and came up with the amount to be demanded in each case, often seeking counsel from other adjusters she befriended. She contended respondent was not involved in this process unless there was a specific problem with a particular client. Ms. Lalumandier alleged her performance was measured on how many cases she had settled and how much money was brought in. She testified the largest case she settled was for $162,000, involving a cervical disc injury, and that she settled several cases for as much as $100,000 to $150,000 without any input from respondent.
As to the Chinn matter, she stated that she was present when respondent stated he did not want to notify his malpractice carrier of his actions relative to the dismissal of the case since it would cost him a $5,000 deductible. She stated that, during the last month that she worked for respondent, the Chinns called several times regarding the status of their case.
Ms. Lalumandier contended she left her employment with respondent because it became stressful to operate respondent's practice when he was disinterested in the *681 practice of law and tried to limit the work on his part to bringing in clients.[15]

2. Testimony of Wendy LeBleau
Ms. LeBleau's testimony relative to the Chinn matter and the operation of respondent's law practice paralleled the testimony of Ms. Lalumandier. She testified that in addition to interviewing clients and executing employment contracts, she and Ms. Lalumandier resolved the overwhelming number of non-litigation files with essentially no direct input from respondent. Ms. LeBleau testified that during respondent's lengthy absences from the office, new cases would be accepted and settled. As to the availability of Mr. Shipp for advice, Ms. LeBleau stated that he was not involved in respondent's practice, and that she had virtually no contact with him about respondent's files.
Finally, as to the allegations of client solicitation, Ms. LeBleau testified respondent would call her from time to time to find out if someone had sent in a new client and request that she issue checks for payments to the referring clients. She alleged she issued the checks as directed, and made specific memo entries in the financial records to indicate the reason for payment.[16]

3. Testimony of Respondent
Respondent's testimony contradicted that of his former employees, Ms. LeBleau and Ms. Lalumandier, in many respects. As to the Chinn matter, he testified, when he spoke to Mrs. Chinn on the one occasion following the dismissal of her case, he advised he thought he could win the case on appeal and, if not, they could seek recovery in malpractice. He testified that he gave her the name and telephone number of his malpractice carrier, as well as notified his carrier of the loss. He testified he believed they abandoned their claim since they did not call him back.
As to the operation of his office, respondent maintained that he was the "P.R. guy" for the firm and his non-attorney staff did the work on the cases. He testified he met his clients when he was in the office, whether it would be in the interview stage or settlement distribution phase, but conceded he did not review every file.[17] *682 When questioned by the committee, respondent admitted there were often cases that were handled from the interview stage to the settlement distribution without any involvement on his part.[18] Respondent conceded he authorized Ms. Lalumandier to negotiate settlements, and that he did not get involved in the nonlitigation cases, reasoning it was "routine" and that non-lawyers deal with insurance adjusters better than lawyers.[19] As convincing *683 evidence of his adequate supervision of his employees, respondent referred to the existence of his "employee office policy manual," which according to respondent had the appropriate checklists and guidelines for his employees to process his cases.[20] He contended it included, among other things, information relative to the amount to demand in cases.[21] While he testified he handled the settlements of all cases over $25,000, he was unaware Ms. Lalumandier settled a case for $162,000 without his involvement. Respondent conceded he supervised Ms. Lalumandier's performance exclusively based on graphs evidencing how many cases she settled and the gross income generated from the cases.
Respondent testified that his absences from his office were half as long as alleged by his employees. He maintained he left Ms. Lalumandier in charge of the office and he got the impression she believed the office was hers due to his many absences. Respondent's testimony paralleled his response to the formal charges relative to the operation of the office in his absences. Specifically, he claimed he periodically checked in with his office, his staff knew how to reach him, Mr. Shipp was available for assistance and the rubber stamp was to be utilized for only routine correspondence.
In mitigation, respondent testified his thirteen-year old son was accidentally killed and his father passed away in 1994. Additionally, he and his wife divorced and his mother committed suicide. He stated that his absences from his office stemmed from his need for religious counseling and need to "figure out some reason ... to stay alive."

Factual Conclusions
Having reviewed the record, we accept the credibility determinations made by the hearing committee with regard to the testimony of Ms. Lalumandier and Ms. LeBleau. Despite the board's statement that the testimony of these witnesses was not corroborated, the record reveals that much of their testimony was, in fact, corroborated by respondent's own testimony. Accordingly, accepting the committee's factual *684 findings, we now turn to a discussion of whether these findings are sufficient to demonstrate professional misconduct on the part of respondent.

Analysis of the Misconduct
The allegations of misconduct against respondent fall under two broad categories. The first category involves allegations that respondent engaged in solicitation by offering persons money or other consideration in exchange for referring clients to him. The second category involves allegations that respondent neglected his law practice and failed to supervise his non-lawyer assistants, allowing them to engage in the unauthorized practice of law.

1. Solicitation
Solicitation of prospective clients by lawyers is strictly regulated by Rule 7.2 of the Rules of Professional Conduct. For purposes of the instant case, subsections (a) and (d) of Rule 7.2 is relevant. Those subsections provide:
(a) A lawyer shall not solicit professional employment in person, by person to person verbal telephone contact or through others acting at his request or on his behalf from a prospective client with whom the lawyer has no family or prior professional relationship when a significant motive for the lawyer's doing so is the lawyer's pecuniary gain.
* * *
(d) A lawyer shall not give anything of value to a person for recommending the lawyer's services....
The hearing committee made a factual finding that respondent made payments to Nat Wilson, Ruby Moore and Terry Washington for referring clients to him.[22] These findings are supported by an extract from respondent's account records, which indicate Mr. Wilson, Ms. Moore and Mr. Washington were given cash payments by respondent for referral of clients.
Accordingly, we conclude the ODC proved by clear and convincing evidence that respondent violated Rule 7.2.[23]

2. Neglect/Failure to Supervise Non-Lawyer Assistants/Facilitation of Unauthorized Practice of Law
The common theme which runs through these charges is that respondent neglected his law practice for a lengthy period of time. During this time, he failed to exercise any meaningful supervision over his non-lawyer assistants, essentially requiring them to practice law in his absence in order for the firm to continue to operate.
Rule 1.3 of the Rules of Professional Conduct provides "[a] lawyer shall act with reasonable diligence and promptness in representing a client." By respondent's own admission, he was absent from his law office for a lengthy period. He conceded that during this time "files had been languishing in the filing cabinet without *685 work." According to respondent, many clients were "complaining bitterly" and nearly "every file had been neglected, the client not kept in touch with ..." This clear and convincing evidence demonstrates respondent violated Rule 1.3.
Rule 5.3 of the Rules of Professional Conduct defines the lawyer's responsibilities with regard to supervision of nonlawyer assistants. That rule provides, in pertinent part:
(b) A lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
(c) A lawyer shall be responsible for conduct of such a person that would be a violation of the rules of professional conduct if engaged in by a lawyer if:
(1) The lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
(2) The lawyer is a partner in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.
Rule 5.5(b) prohibits the lawyer from assisting a person who is not a member of the bar in any activity which constitutes the unauthorized practice of law.
Respondent conceded that he had become "lax" in the supervision of his office. The testimony of Ms. Lalumandier reveals that the word "lax" is an understatement. According to Ms. Lalumandier, respondent had "absolutely nothing to do with the non-litigation files whether he was there are not." Ms. Lalumandier was given complete responsibility for negotiating settlements with no involvement from respondent. Ms. LeBleau corroborated Ms. Lalumandier's testimony, explaining that she and Ms. Lalumandier resolved an overwhelming number of the non-litigation files with no input from respondent.
In Louisiana State Bar Ass'n v. Edwins, 540 So.2d 294, 299 (La.1989), we explained the lawyer's professional judgment is essential to the practice of law:
Functionally, the practice of law relates to the rendition of services for others that call for the professional judgment of a lawyer. The essence of the professional judgment of the lawyer is his educated ability to relate the general body and philosophy of law to a specific legal problem of a client; and thus, the public interest will be better served if only lawyers are permitted to act in matters involving professional judgment, [citation omitted].
While we recognized a lawyer sometimes delegates tasks to non-lawyers, we made it clear that such delegation is proper only if "the lawyer maintains a direct relationship with his client, supervises the delegated work, and has complete professional responsibility for the work product." Id.
The evidence in this record demonstrates respondent utterly and completely failed to comply with his professional obligations, and abdicated his professional responsibilities over the practice of law, allowing his non-lawyer assistants to run his practice with only token supervision. Indeed, respondent's only significant "supervision" of his law practice occurred when he reviewed monthly graphs indicating the number of cases settled and income generated. Rather than exercising his professional judgment to relate the law to the specific legal problem of his clients, respondent crafted vague settlement guidelines intended to govern all client matters. His own admissions establish that he viewed the settlement of his cases as a *686 "routine" or "cookie-cutter" procedure. Such a philosophy is clearly at odds with the lawyer's obligation to provide a client with the benefit of the lawyer's legal training and experience to resolve the client's specific legal problem.
Under these circumstances, we conclude the ODC has proven by clear and convincing evidence that respondent has violated Rules 1.3, 5.3 and 5.5.

Sanctions
Having found violations of the Rules of Professional Conduct, we now turn to a determination of an appropriate sanction for this misconduct. In determining a sanction, we are mindful that the purpose of disciplinary proceedings is not primarily to punish the lawyer, but rather to maintain the appropriate standards of professional conduct, to preserve the integrity of the legal profession and to deter other lawyers from engaging in violations of the standards of the profession. In re: Vaughan, 00-1892 (La.10/27/00), 772 So.2d 87; In re: Lain, 00-0148 (La.5/26/00), 760 So.2d 1152. The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. In re: Redd, 95-1472 (La.9/15/95), 660 So.2d 839; Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984).
The jurisprudence makes it clear that respondent's violation of Rule 7.3's prohibition on solicitation of clients constitutes serious misconduct. In Louisiana State Bar Ass'n v. St. Romain, 560 So.2d 820 (La.1990), we explained that "[s]olicitation is abhorrent to the legal profession and places lawyers in disrepute with the public." See also In re: D'Amico, 94-3005 (La.2/28/96), 668 So.2d 730 ("direct solicitation of professional employment from a prospective client in violation of Rule 7.3 is a very serious disciplinary violation that undermines the reputation of lawyers generally and the public's attitude toward the profession"). These clearly indicate the baseline sanction for a violation of Rule 7.3 is disbarment.
Likewise, respondent's neglect of his law practice and failure to supervise his nonlawyer assistants in violation of Rules 1.3, 5.3 and 5.5 is a very serious professional offense. In In re: Brown, 01-2863 (La.3/22/02), 813 So.2d 325, we held disbarment was the appropriate sanction for an attorney who completely delegated the exercise of his professional judgment to a non-lawyer and exercised no supervision over the non-lawyer. See also Louisiana State Bar Ass'n v. Edwins, 540 So.2d at 303 ("disbarment is the prima facie appropriate sanction for the respondent's aiding unauthorized practice violation ..."). Thus, the baseline sanction for this violation is disbarment.
As aggravating factors, we recognize the presence of multiple offenses, refusal to acknowledge wrongful nature of the conduct and substantial experience in the practice of law. In mitigation, we find respondent has no prior disciplinary record and experienced personal and emotional problems during the time in question.
Having considered these factors, we find no basis to deviate from the baseline sanction of disbarment. Respondent's actions fell far below the conduct expected of lawyers in this state and is an affront to those lawyers who strive to provide competent and ethical representation to their clients. The true extent of the harm visited by respondent upon his clients, who were deprived of the benefit of a thoughtful, individualized and professional legal analysis of their cases, may never be known. Under these circumstances, we are firmly convinced we would be remiss in our constitutional duty to regulate the practice *687 of law if we were to impose any sanction less than disbarment.

DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered the name of Lawrence D. Sledge, a/k/a L.D. Sledge, Louisiana Bar Roll number 12132, be stricken from the roll of attorneys and that his license to practice law in the State of Louisiana be revoked. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
KNOLL, J., concurs for additional reasons.
CALOGERO, C.J., dissents for reasons assigned by WEIMER, J.
WEIMER, J., dissents and assigns reasons.
KNOLL, Justice (concurring).
I join in the majority's opinion disbarring respondent, but I write separately to note I find respondent's conduct so unethical, he is deserving of permanent disbarment. Respondent's conduct is a disgrace to the profession and insults and degrades the practicing attorneys who work honestly and diligently in the representation of their clients.
When respondent was retained, he was supposed to represent his clients to the best of his abilities, as he held himself out to the world that he would. His clients expected to receive a competent analysis of their legal problem by a trained legal professional licensed to practice law by this court. Instead, their cases were processed in a "cookie-cutter" fashion by respondent's non-lawyer assistants with little or no supervision from respondent. In many cases, respondent's only interaction with the clients he was supposedly representing came via a videotaped appearance at the commencement of representation and a personal meeting at the conclusion of representation, after settlement had been confected. It is beyond dispute this complete abdication of responsibilities by a lawyer over cases entrusted to him falls far below the standard this court expects of all lawyers who are admitted to practice law in this state. Given his cavalier attitude toward his clients, respondent's acceptance of fees for legal work under these circumstances amounts, in my view, to theft by false pretense.
Respondent attempts to get the sympathy of this court by urging us to accept in mitigation his personal and emotional problems during the time of the misconduct, including the death of his son. I am not persuaded by this mitigating factor to reduce respondent's sanction because during the same general time frame of his misconduct, he wrote and published a fictional novel.[1] It would appear that if respondent was too grief stricken to represent his clients, he would not have had the emotional endurance to write an "adventure thriller" novel.
Moreover, even if I were to accept respondent's argument in mitigation, I would not find any basis to excuse his complete and utter neglect of the legal matters entrusted to him by his clients. Our rules provide a procedure for an attorney to go on inactive status, after taking appropriate *688 steps to protect the interests of his or her clients. Respondent could have availed himself of this procedure.
In sum, the case sub judice represents one of the most egregious examples of outrageous conduct I have witnessed since taking the bench. By his actions, respondent has indicated he has no intention of following the ethical rules promulgated by this court. He represents a clear danger to the public. I find respondent's conduct deserving of permanent disbarment.
WEIMER, J., dissenting.
I agree with the majority that the disciplinary board erred in rejecting certain factual findings by the hearing committee. The findings of the hearing committee were based on credibility evaluations which are supported by the record and are not manifestly erroneous.
While in no manner condoning the actions of the attorney in this matter, I believe the sanction of disbarment is too harsh and, instead, a lengthy suspension would adequately serve the purposes of these disciplinary proceedings.
The penalty recommended by the hearing committee was that the attorney be publicly reprimanded and suspended from the practice of law for a period of one year, with all but sixty days deferred, subject to a two-year conditional period of probation. The penalty recommended by the board was suspension from the practice of law for a period of one year and one day, with all but ninety days deferred. We are not bound by these recommendations. However, disbarment, a severe deviation from the recommendations, is inappropriate and fails to acknowledge the hearing committee's function as the "eyes and ears of this court." See In re Warner, 03-0486 p. 14 (La.6/27/03), 851 So.2d 1029, 1037.
The committee determined respondent knowingly and intentionally handled the Chinns' case in a manner that actually caused injury to them, paid nominal amounts for three client referrals, and systematically allowed the practice of law by a non-lawyer staff member by inadequately supervising his staff. The committee considered these facts in light of the ABA's Standards for Imposing Lawyer Sanctions to arrive at the committee's recommended sanctions.
In this matter, client solicitation was not the focus of the complaint. Rather, the failure of the attorney to adequately supervise his office staff was the focus of the complaint. The majority finds there is no need to deviate from the "baseline sanction of disbarment," citing this court's decisions in In re Brown, 01-2863 (La.3/22/02), 813 So.2d 325, and Louisiana State Bar Association v. Edwins, 540 So.2d 294. For an attorney's "total abdication" of his duties to a non-lawyer assistant, the baseline sanction is disbarment. In re Brown, 01-2863 at 7, 813 So.2d at 329. The term "baseline sanction" is the equivalent of "the prima facie appropriate sanction" before applying the aggravating and mitigating circumstances of the individual case. See Edwins, 540 So.2d at 303, holding disbarment was the prima facie sanction for an aiding unauthorized practice violation.
I respectfully suggest the majority's refusal to deviate from the baseline sanction of disbarment is a failure to distinguish the aggravating and mitigating circumstances in the instant case from the aggravating and mitigating circumstances in Brown and Edwins.
Brown and a non-lawyer who had previously "represented" various personal injury clients and obtained settlements for them from insurance companies entered into a scheme that continued the non-lawyer's *689 activities. Brown actively aided the non-lawyer into deceiving clients by leading them to believe the non-lawyer was an attorney working with Brown. The aggravating factors in Brown were respondent's dishonest or selfish motive, refusal to acknowledge wrongful conduct, and substantial experience in the practice of law; the sole mitigating factor was a lack of prior disciplinary charges. In re Brown, 01-2863 at 7, 813 So.2d at 329.
Similarly, Edwins knowingly assisted a paralegal to engage in the unauthorized practice of law. He established a "branch office" in Lafayette, the site of the paralegal's previous office. He facilitated the handling of a case by the paralegal in which an illiterate client's case was settled, without the client's consent, for $9,000; the client received only $1,000 and the remainder was kept for legal expenses and a fee. See Edwins, 540 So.2d at 297. In Edwins, the aggravating factors were numerous prior disciplinary offenses, dishonest or selfish motive, a pattern of intentional misconduct for a number of years, multiple offenses in the current proceeding, bad faith obstruction of the disciplinary proceeding, lack of candor, indifference to making restitution, refusal to acknowledge wrongful conduct, and vulnerability of victims, such as an illiterate client-victim. Edwins failed to introduce any credible evidence to serve as a mitigating factor. Edwins, 540 So.2d at 303-304.
In contrast, respondent in the instant case and his staff did not deceive either clients or insurance adjusters as to the fact his staff was comprised of non-lawyers. Although respondent aided non-lawyers in illegally engaging in the practice of law by failing to supervise, intentional deceit was not the motive. Thus, the aggravating factors recognized by the majority herein, multiple offenses and refusal to acknowledge wrongful nature of conduct, were not nearly as egregious as those same factors in the cited cases. Respondent's substantial experience in the practice of law is an aggravating factor that is not disputed, as is the mitigating factor that respondent has no prior disciplinary record.
Further, I believe the majority fails to accord sufficient weight to other mitigating factors herein. In contrasting the aggravating and mitigating factors, the majority fails to mention that the charges of "multiple offenses" brought against respondent were not the result of complaints by clients or persons with whom the respondent's staff dealt in settling cases. Simply stated, there were no client complaints.
More importantly, the "personal and emotional problems" experienced by respondent during the time in question were extraordinarily tragic. Respondent's thirteen-year old son was accidentally killed and respondent's father passed away in 1994. Respondent and his wife divorced and respondent's mother committed suicide. Respondent testified his absences from his office stemmed from his need for religious counseling and need to overcome despondency. These events are in stark contrast to the sole mitigating fact of lack of previous disciplinary actions in one of the cited cases and the lack of any mitigating factor in the other cited case.
For the foregoing reasons I dissent from the majority opinion imposing the sanction of disbarment.
NOTES
[1] Respondent's name is listed as "L. D. Sledge" on the bar rolls of this court.
[2] On appeal, the court of appeal affirmed the judgment of dismissal and this court denied writs. Chinn v. Mitchell, 98-1060 (La.App. 1 Cir. 5/14/99), 734 So.2d 1263, writ denied, 99-1772 (La.7/2/99), 747 So.2d 7.
[3] Respondent testified at the formal hearing that he told his clients that if he did not win the appeal, "you've got me." He states he explained to her he had malpractice insurance, and stated that "if it [the appeal] doesn't work, you got that." However, respondent concedes he did not advise his clients of the time delays for a legal malpractice action.
[4] The record indicates the amounts paid ranged from $50 to $100 per referral. There is also evidence in the record suggesting respondent gave non-monetary compensation, such as gift certificates or hams, to persons who referred clients to him.
[5] Respondent admits he gave Barbara Wilson money" for something or other;" however, his financial records indicate he paid her settlement funds from two cases he handled for her. While he alleges in his response to the complaint that she referred clients to him, the record does not contain evidence he gave her anything of value for a referral. Additionally, in his response to the complaint, respondent admits he paid funds to Ora Moore for a client referral. However, respondent recanted this assertion at the formal hearing, stating the funds were an advance on living expenses while he represented her in a pending case. Ms. Moore corroborated respondent's testimony.
[6] It is undisputed that the general policy in the office was to demand in every soft tissue case $2,000 for each month of active medical treatment, and to accept nothing less than $1,000.
[7] Often, the only time the client actually "saw" respondent was through a videotape, which was shown to prospective clients. Respondent had prepared several videos to show to prospective clients. The video shown was dependent on the nature of the needs of the prospective client. Although the videotapes were not introduced into evidence, respondent testified the videos typically stated the client would receive $1,000 in pain and suffering for each month of active medical treatment and disability.
[8] During this time, respondent attended Church of Scientology retreats in Florida and authored a novel, which was published in late 1998. The exact amount of time respondent was away from the office is disputed. There is testimony in the record indicating respondent was out of the office for six months in 1996, six months in 1997, and three months in 1998. In contrast, respondent testified that he was absent in 1996 anywhere from one to three months, in 1997 for one to two months and in 1998 for six weeks. It is undisputed respondent would often periodically come into the office for a few days after being gone for several weeks so as to handle pending matters.
[9] In his March 12, 1999 response to the complaint, respondent wrote:

During 1998 my income drastically dropped. I felt like I was being squashed for I couldn't find the answer to why cases weren't moving and income was being cut. I even considered quitting the practice of law ... I was looking for a means to survival ...
I started digging in my office for the reason why, and began uncovering some terrifying facts. Files had been languishing in the filing cabinet without work, taxes had not been paid, bills were in collection, clients were complaining about Wendy [LeBleau] treating them shabbily and not being called back. These were just the surface ...
* * *
I have now a very professional and productive staff in an upbeat, highly professional setting, like it should have been. The new staff can testify, if needed, just what had gone awry in my practice, for it was terribly evident in my files how they had not been worked. I had been working in my office, trying to find out what was going on, relying on Lil [Lalumandier] to supervise, and that was my fault. Whereas it was detrimental reliance, it was my responsibility to oversee her. I slipped into a program of delegation.
... My [new] staff even works late with me, and we are having a great time and the clients are exhilarated, whereas I was being fired by clients and many were complaining bitterly at the end of 1998. I have turned it all around.
...I did become lax in my supervision of my office, and allowed others to run sections while I stayed distracted by the many things I had to do on a day to day basis. My office had become inefficient and out of control while [the old staff members] were here, with the office manager being the "boss" and she herself more concerned about being right than the office's survival. Their leaving was the best thing that has happened to me personally and my law practice since 1987.
In his earlier response to the complaint dated February 19, 1999, respondent wrote:
... I learned after [Ms. LeBleau] quit ... that I was being fired by three clients who said she would never call them back, nearly every file had been neglected, the client not kept in touch with ...
* * *
... I have spent the last month and a half in the office 12-14 hours a day correcting files that have been neglected, trying to recover lost parts of files and in general trying to recover clients and work on files that were literally wasted by Wendy LeBleau. [Emphasis added.]
[10] Originally, there were five counts of formal charges filed against respondent. However, in brief to this court, the ODC concurred in the board's dismissal of Count V, relative to a failure to supervise a suspended lawyer in respondent's employ. We will make no further reference to this charge in the memorandum.
[11] The committee did not discuss the specific rule violations as to each count of misconduct.
[12] Respondent was admitted to practice law in Louisiana in 1960, twenty-seven years at the time of the misconduct.
[13] Ms. Lalumandier testified to respondent's lack of involvement in the disposition of nonlitigation matters:

A: Mr. Sledge had absolutely nothing to do with non-litigation files whether he was there or not. The litigation filed, he had nothing to do with the day to day monitoring or running of those files as far as when to send out discovery, getting clients in for answering, that sort of thing. He would get a pet file here and there that he would pay some attention to, and he would tell me that this was a file he could get excited about. So on those files that he had some affinity for or some interest in, he would pay attention to and dictate letters on. But basically, the officewith him not being there, the office hadit was like a machine that just kept running. I mean, he wasn't there most of the time.
* * *
A: My job other than office management was to be in charge of settling the non-litigation files. That's what he would ask me to do, and that's what I did. That was 90 percent of my job.
Q: Okay, and what was involved in setting non-litigation matters?
A: Total negotiation with the adjusters.
Q: Okay, and would you get the client's permission to settle cases?
A: Yes.
Q: Was Mr. Sledge contacted or involved at all in the settling of cases?
A: No, he was not.
Q: Was Mr. Sledge aware that you were settling any particular case at any particular time?
A: Mr. Sledge was aware on a daily or weekly basis. He'd ask me at least once a week how many cases I settled and how much money I had brought in.
Q: Okay. Did he give you any directions as to settling cases?
A: No...
[Emphasis added.]
[14] Randall Shipp testified at the formal hearing that he leased space from respondent and would occasionally associate with him on cases. Mr. Shipp testified respondent never requested that he take over anything in his office or supervise his staff while he absent. Mr. Shipp corroborated Ms. Lalumandier's testimony that the staff would occasionally ask him questions about files, to cover a court appearance that could not be rescheduled, or to talk to a client.
[15] Ms. Lalumandier testified as to why she left her employment with respondent:

Q: Why did you leave his employ?
A: I became more and more concerned that L.D. was notand I think he'll tell you thisL.D. was very disinterested in the practice of law. He had hoped to be a writer. He did not like doing the day-to-day of legal work. At various times, he tried to find other ways for his office to function so that he didn't have to do the legal work, that he would only be responsible for getting clients. I found during the last six months that L.D. became abusive to [his] staff, and I left when I went to see him about a particular conversation he had with a staff member. And I was just concerned ofI just didn'tI was 53 years old and just didn't want to be yelled at or have to be the buffer between him and these other young girls in the office, so I left.
[16] Ms. LeBleau's testimony relative to the solicitation of clients was corroborated by the respondent's bookkeeper, Jennifer Cangelosi, who testified she made out checks for payment of referral fees to clients, and that respondent would direct her from time to time to write a check for such.
[17] Respondent's testimony at the formal hearing indicates that he did not review every client file:

Q: Did you review each and every file in the office at some point, whether it's at closing or before settlement or at some point?
A: Okay. What we would do, when I was there, I'm the PR guy. I know this. I may not be the smartest guy in town, but I know how to handle my clients, and I guess that's one of the reasons I've got a lot of clients, but what had happened whenever we settled the case, I would always go out, and we had a little room in the front, and then we'll sit the client down at this table, and we would have the disbursement sheet here and the checks here and all this stuff, and we'd go over this thing, and I would shake their hand and they'd tell me what a great job I did. I know [Ms. LeBleau] and them had done that, but, you know, they thought I was doing it, you know, and they thanked me so much for doing a great job, and that's the way we did it.
When I was there, on every settlement that was a rule. I saw them coming in and if I'm there I signed them up. I put them on the conveyor belt, and at the end they're happy going out, and I'm going to make sure they're happy. And I always and I find a lot of lawyers don't do this,... but I always made sure my client got more money than I did even though we paid a lot of medical bills out of this thing, so the client has to be happy.
Q: Okay, so as long as the client was happy, you had no particular reason to review a specific file?
A: It was ait just like, look, I've got so many cakes coming out of the oven, and it looks like they're all good, you know.
[Emphasis added.]
[18] Respondent was questioned by a committee member relative to his failure to participate in any respect in many client matters:

Q: We've had at least two witnesses testify that there were many times in '96, '97 and '98 where clients came into the office, were interviewed, signed up, cases settled, where you never had any involvement whatsoever in that file. Is that true?
A: Probably. It could be.
[19] Respondent testified as to Ms. Lalumandier's exclusive handling of the non-litigation settlement matters:

Q: Okay. Did you know that Lil was negotiating settlements on non-litigation cases?
A: Yes.
Q: Did she have your authority to do that?
A: Yes.
Q: Okay. Did you give her any guidelines or instructions about settling those cases?
A: Oh, yes.
Q: What did you
A: Like I said, we had a hat that was written up on settlement of cases and parameters and stuff, get as much as you can, you know. We knew whatit's a cookie-cutter. It's routine. You call and they offer you $500 and you ask for $2,000 a month, and then you go to $1,000. If you get $1,200, you do it, but it's just boom, boom, boom like that.
Q: Okay, so is it correct to say that you really didn't get that involved in non-litigation cases?
A: Not really. Not really. It was like they were on automatic. It was programmed, boom, boom, and it was a paralegal dealing with a paralegal. That is like two insurance adjusters but basically paralegals.
Q: Okay.
A: And I learned years ago when I first started doing this that a nonlawyer could deal with a nonlawyer adjuster a whole lot better in many ways than a lawyer could. You can always go back to him after you've said no.
Q: Okay.
A: A lawyer can't. He's got pride. He's got to go sue then.
[Emphasis added.]
In concluding the hearing, one committee member questioned respondent, expressing concern about the unauthorized practice of law allegations:
Q: ... I'm concerned about someone making judgment calls and deciding what number to settle a case for, and I'm having a hard time figuring out how that does not encompass the practice of law where a person trained in the law examines the facts, examines the law, the cases, as anyone who does this kind of work would do a quantum analysis, a quantum study, comparative negligence issues, fault issues, and make some judgment call on what's this case worth? At what point should this case be settled without bringing the case into the courtroom and having a judge or jury decide it.
A: Well, I can understand your concern, but the paralegals or the non-litigation people who work for me don't have to make those decisions because the cases that they have are so very cut and dry. [The clients] get hit in the rear, they're going to a doctor, and then by the time you get to the point that we settle the case, the medical report comes back and say they've had three months of injury. They feel like they're well, and they can go back to work, and so that fits this scenario, and that's what we're talking about that they can settle. It's just a real little package.
[Emphasis added.]
[20] Respondent failed to produce the manual prior to and at the hearing, stating he simply "did not think about it." One month following the formal hearing, respondent filed an offer of proof seeking to submit the manual into evidence. The hearing committee denied respondent's formal offer of proof, but the disciplinary board considered it. The document submitted by respondent is not in the form of an actual manual, but rather consists of a loose connection of documents which appear to have been produced over several years.
[21] When questioned by a committee member as to whether the manual had specific provisions listing parameters for settlement of cases, respondent responded:

Well, yes. There is a policy in there relative to settlement of cases and whatwe're talking about soft tissue damage. We're talking about things that the non-litigation department would be handling, yes, and the parameters are what I've said. You know, "Get what you can get. Get as much as they can give you."...
[22] The committee also found respondent made payments to Ora More for the referral of clients. The disciplinary board concluded this finding was clearly wrong in light of Ms. Moore's testimony that respondent did not pay her for sending business to him. We agree with the board that the committee's finding as to Ms. Moore was clearly wrong.
[23] Although our finding of solicitation is limited to the three specific instances, there are hints of a much wider practice of solicitation in the record. In particular, we note the record contains references to a "ham list," a list for clients to whom respondent sent a ham at Christmas time. There is a suggestion that clients who referred new clients would be placed on this list. However, the ODC did not investigate this "ham list" in detail. In the absence of more definitive proof, we decline to find any evidence of solicitation beyond the four instances previously identified.
[1] According to a review published on the Internet, the novel, entitled "Dawn's Revenge," is a story of a New Orleans lawyer who discovers a conspiracy involving the brutal rape and murder of his housekeeper's daughter.