889 So.2d 236 (2004)
In re John B. COMISH.
No. 2004-B-1453.
Supreme Court of Louisiana.
December 13, 2004.
*237 Charles Bennett Plattsmier, Chief Disciplinary Counsel, Julie Brown White, Assistant Disciplinary Counsel, for Applicant.
Leonard Cardenas, III, Baton Rouge, John Byron Comish, for Respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS.
PER CURIAM.
This disciplinary matter arises from three counts of formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, John B. Comish, an attorney licensed to practice law in Louisiana.

UNDERLYING FACTS

Count I
In 1996, respondent hired Michael Matthews, a disbarred Louisiana attorney, to *238 work in his law office as a paralegal.[1] Sometime thereafter, respondent's aunt, June White, retained respondent to handle the succession of her deceased husband, Ralph White.
In November 1996, Mr. Matthews went to Mrs. White's home in Alexandria to pick up a check for legal fees. Mrs. White's $8,000 check was made payable to Mr. Matthews; the memo on the check indicated that it was for "lawyer fees." With the consent of respondent, who was out of town at the time, Mr. Matthews deposited the check into his personal account and kept approximately $2,400 for his own use. Mr. Matthews then wrote a check to respondent for the balance of the sum paid by Mrs. White.
Mr. Matthews subsequently filed the pleadings to open Ralph White's succession. Succession of White, No. 29,704 on the docket of the 9th Judicial District Court for the Parish of Rapides. Mr. Matthews signed respondent's name as notary on one of these pleadings, the oath of the administrator, which had been executed by Mrs. White's son. Respondent gave Mr. Matthews permission to notarize the document with his signature.

Count II
In 1997, Malik Ihsan retained respondent to represent him in a personal injury matter stemming from a slip and fall accident. Respondent admitted that with his permission, Mr. Matthews negotiated settlements directly with insurance adjusters, including Ms. Cigale Chaffers, the adjuster handling Mr. Ihsan's claim.

Count III
In 1992, respondent prepared a will for James Collins. When Mr. Collins died in July 1997, his widow, Betty, discovered that the will was invalid because respondent had failed to date it. Mrs. Collins paid respondent $750 to probate the defective will. In July 1999, Mrs. Collins complained to the ODC that she was having difficulty reaching respondent. In February 2000, respondent filed a petition to probate the will, but it was rejected by the trial court because the will was undated. In April 2000, respondent refunded $750 to Mrs. Collins at her request. Respondent admitted that he allowed Mrs. Collins' legal matter to "fall through the cracks," and he expressed remorse for his conduct.

DISCIPLINARY PROCEEDINGS

Formal Charges
After investigation, the ODC filed three counts of formal charges against respondent. In Count I, it alleged respondent's actions violated Rules 5.3 (responsibilities regarding non-lawyer assistants), 5.5(b) (assisting a person who is not a member of the bar in the performance of an activity that constitutes the unauthorized practice of law), and 8.4(d) (engaging in conduct prejudicial to the administration of justice) of the Rules of Professional Conduct. In Count II, it alleged respondent's actions violated Rules 5.3 and 5.5(b). Finally, in Count III, it alleged that his conduct constituted a violation of Rules 1.1 (failure to provide competent representation to a client), 1.3 (failure to act with reasonable diligence and promptness in representing *239 a client), and 1.4 (failure to communicate with a client).
Respondent answered the formal charges. Although he generally admitted the factual allegations of the charges, he denied engaging in any knowing misconduct.

Formal Hearing
This matter proceeded to a formal hearing before the hearing committee, at which time the parties submitted joint stipulations of fact. The ODC presented the testimony of four witnesses: Betty Collins, the complainant in Count III of the formal charges; Andrew Caffey, a Maryland attorney who corresponded with Mr. Matthews in connection with the White matter subject of Count I of the formal charges; Cigale Chaffers, the insurance adjuster who corresponded with Mr. Matthews in connection with the Ihsan personal injury matter subject of Count II of the formal charges; and Mr. Matthews. Respondent testified on his own behalf and on cross-examination by the ODC. He also called his former secretary, Amanda Hall, to testify before the committee.
The ODC submitted a binder of documentary evidence in further support of the formal charges, including correspondence between Mr. Matthews and Mr. Caffey relating to the White matter. Three letters from Mr. Caffey are addressed to Mr. Matthews as "Attorney" or "Attorney at Law." A letter dated July 7, 1997 and signed "Sincerely yours, Michael J. Matthews," is written on the letterhead of respondent's law firm, John B. Comish and Associates/Attorneys at Law * Notaries Public. Mr. Matthews did not designate himself as a paralegal or otherwise indicate that he is not an attorney licensed to practice law in Louisiana. Moreover, in this letter, Mr. Matthews advised Mr. Caffey on the requirements of Louisiana succession law.
Mr. Caffey testified that he represented Logan Farms, Inc. in connection with a Honey Glazed Ham Store franchise owned by Mr. Ralph White prior to his death. After Mr. White died, his son, Steven, assumed the operation of the business. Logan Farms gave Mr. Caffey Mr. Matthews' name as the lawyer handling Mr. White's succession.[2] Mr. Caffey spoke with Mr. Matthews by telephone on May 22, 1997 to discuss with him the transfer of the ham store franchise to Steven White. At the time of this call, Mr. Caffey was under the impression that Mr. Matthews was an attorney. As a follow-up to the telephone conversation, Mr. Caffey wrote a letter on May 23, 1997 addressed to "Mr. Michael Matthews, Attorney." Mr. Caffey testified that he corresponded with Mr. Matthews for nearly two months in an effort to resolve the ownership of the franchise, but Mr. Matthews never corrected Mr. Caffey's mistaken impression that he is a lawyer. In early July 1997, a third party suggested to Mr. Caffey that Mr. Matthews might not be an attorney. Thereafter, Mr. Caffey asked Mr. Matthews in a telephone conversation on July 7, 1997 whether he is a practicing attorney. Mr. Matthews said that he was.
The record also contains correspondence between Ms. Chaffers and Mr. Matthews concerning the Ihsan personal injury matter. Like the correspondence from Mr. Caffey, two letters from Ms. Chaffers are addressed to "Michael J. Matthews, Attorney at Law." Mr. Matthews wrote four letters to Ms. Chaffers on the letterhead of respondent's law firm and signed them "Sincerely yours, Michael J. Matthews." Once again, Mr. Matthews did not designate *240 himself as a paralegal or otherwise indicate that he is not an attorney. Moreover, in his letter dated December 4, 1997, Mr. Matthews offered to settle Mr. Ihsan's personal injury claim for $7,500 plus medical expenses.
Ms. Chaffers testified at the hearing that she was employed as an adjuster for Commercial Union Insurance Company for seventeen years. In that capacity, Ms. Chaffers handled the personal injury claim asserted by Mr. Ihsan against Commercial Union's insured, Blue Ribbon Supermarket. In May 1997, Mr. Ihsan informed Ms. Chaffers that he had retained respondent to represent him. On June 3, 1997, Ms. Chaffers received correspondence from Mr. Matthews on the letterhead of respondent's law firm advising that "our office" represented Mr. Ihsan. Thereafter, Ms. Chaffers dealt exclusively with Mr. Matthews in connection with Mr. Ihsan's personal injury claim. Ms. Chaffers testified that she presently has no independent recollection of Mr. Ihsan's claims file, but in an affidavit dated June 12, 2000, Ms. Chaffers attested that Mr. Matthews represented to her that he was Mr. Ihsan's attorney, and that at no time did Mr. Matthews ever disclose to her that he did not have a license to practice law.
Mrs. Betty Collins testified to her efforts to determine the status of the legal matter involving her husband's undated will. Mrs. Collins said that when she telephoned respondent, she was always told that he "wasn't there." Mrs. Collins stopped by respondent's office more than fifteen times, but he was in on only three occasions. After Mrs. Collins filed a complaint with the ODC, respondent met with her and assured her that he would proceed with the matter. Nevertheless, the level of communication did not improve. Mrs. Collins testified that as of the date of the hearing, she was unsure whether respondent was still representing her in an effort to complete her husband's succession.
The ODC called Mr. Matthews to testify in person before the committee. Mr. Matthews testified that he and respondent are long-time friends, so when respondent needed some help at his law office, Mr. Matthews agreed to work for him. Mr. Matthews was paid a salary of $500 per week. Respondent's supervision was somewhat "informal," according to Mr. Matthews, though when his employment first started respondent was in the office on a regular basis. However, at some point, respondent began spending less time in the office.[3]
With respect to the White matter, Mr. Matthews testified that he was introduced to Mrs. White and her son, Steven, as respondent's paralegal. This meeting occurred in the presence of respondent's secretary, Amanda Hall. Ms. Hall confirmed that the introduction was made in the manner Mr. Matthews described.
Later, Mr. Matthews went to Alexandria to collect information from Mrs. White concerning her husband's business affairs. As he was leaving the house with a folder full of documents, Mrs. White told him that she had written a check for the legal fees and put it in the folder. Mr. Matthews testified that he did not look at the check until he returned to the office later that afternoon, when he and respondent's secretary were dismayed to find that the check was payable to Mr. Matthews, not respondent. Because respondent was out of town, his secretary talked with him *241 about the situation over the telephone. Respondent instructed Mr. Matthews to endorse the check and deposit it into his personal account, then write a check to the office for respondent's share of the funds. Respondent told Mr. Matthews he could keep the difference (over $2,000) so that he could buy a truck.[4]
Concerning Mr. Caffey, Mr. Matthews testified that he identified himself as respondent's "legal assistant" when he first spoke with Mr. Caffey by telephone, and stated that he was contacting Mr. Caffey "at the request of Mr. Comish in connection with the ongoing handling of the White estate." Mr. Matthews stated that Mr. Caffey appeared to understand this, and so he did not consider it "necessary" to identify himself as a paralegal when he sent letters to Mr. Caffey.[5] Finally, Mr. Matthews said that he "verbally" corrected Mr. Caffey when he sent the first letter addressed to Mr. Matthews as an attorney. Mr. Matthews also called the issue to respondent's attention, and respondent seemed satisfied with Mr. Matthews' explanation that he had spoken with Mr. Caffey and made him aware that he was mistaken in that regard. In response to the questions of a hearing committee member, Mr. Matthews said that he was not aware of any misunderstanding by Mr. Caffey beyond that point, even when he received two more letters from Mr. Caffey addressed to him as an "Attorney at Law."
On cross-examination, Mr. Matthews testified that respondent "supervised everything that went on" in the office. Mr. Matthews denied telling Mr. Caffey that he is an attorney in response to Mr. Caffey's specific question on that point. Similarly, Mr. Matthews denied the allegations made by Ms. Chaffers that he held himself out to her to be an attorney. Mr. Matthews denied any recollection of seeing the letters from Ms. Chaffers addressed to him as "Attorney at Law," though he responded to one of the letters; Mr. Matthews later admitted that he may have seen the letters, but simply overlooked the "attorney" reference. In short, Mr. Matthews testified that he was unaware of any misconception on the part of any person that he was a licensed attorney, but "if became aware of it I certainly corrected it."
Respondent's testimony was generally consistent with the testimony of Mr. Matthews. Respondent testified that when he learned of the letter written by Mr. Caffey addressing Mr. Matthews as "Attorney at Law," he instructed Mr. Matthews to correct the situation immediately. Respondent then instructed his secretary, Ms. Hall, that "all correspondence, all introductions must be as paralegal." Respondent admitted that his procedures in this regard were not formal, however, and he also admitted that he did not know whether Mr. Matthews followed these instructions. Nevertheless, respondent claimed that he adequately supervised Mr. Matthews and pointed out that Mr. Matthews was never left alone "to run that office or make any decisions." Respondent said that even on the occasions when he was out of town, *242 other lawyers with whom he shared office space were "left in charge."

Hearing Committee Recommendation
The hearing committee accepted the stipulations of fact agreed to by respondent and the ODC. Considering the evidence presented at the hearing, the committee made the following additional factual findings:
In Count I, concerning the White matter, the committee found that Mr. Matthews dealt exclusively with Mr. Caffey as the legal representative of the Whites; that respondent did not take the necessary steps to advise those dealing with Mr. Matthews, and in particular Mr. Caffey, that Mr. Matthews is not an attorney, but in fact is a paralegal; and that Mr. Caffey believed Mr. Matthews to be an attorney.
In Count II, the Ihsan matter, the committee found that respondent had no formal policy in place to prevent third parties from getting the impression that Mr. Matthews is an attorney, and that respondent did not follow up to correct the impression that Mr. Matthews is an attorney.
Finally, in Count III, the Collins matter, the committee found that as a result of respondent's action, Mrs. Collins has not received the property that her husband attempted to leave her in his will; that Mrs. Collins is still unsure of respondent's representation of her in this matter; that Mrs. Collins has received no benefit but has suffered loss as a result of respondent's actions; and that respondent did not notify Mrs. Collins of her rights to proceed against him.
Based on these factual findings, the committee determined that respondent violated the Rules of Professional Conduct as charged in the formal charges. With respect to Count I, the committee found that respondent engaged in conduct that was prejudicial to the administration of justice when he allowed Mr. Matthews, a disbarred lawyer, to sign respondent's name as notary on a document that was placed into the public record.[6] With respect to Counts I and II, the committee found that respondent violated Rules 5.3 and 5.5(b) by failing to properly supervise Mr. Matthews and by assisting him in conduct that constitutes the unauthorized practice of law. The committee rejected respondent's assertion that he adequately supervised Mr. Matthews. To the contrary, the committee found overwhelming evidence that Mr. Matthews acted without supervision in the negotiation with Mr. Caffey of the Logan Farms dispute, and with Ms. Chaffers in the negotiation of the personal injury claim of Mr. Ihsan. When respondent was advised that a misunderstanding existed regarding Mr. Matthews' role as a paralegal, respondent took no affirmative steps to correct the misunderstanding other than to advise Mr. Matthews to take care of it. The committee concluded that if respondent had been adequately supervising Mr. Matthews, he would have seen the continuous references to Mr. Matthews as an attorney in the communications from various parties and would have taken steps to correct the problem. Respondent also failed to institute any procedure to prevent *243 the misunderstanding from occurring with future clients.
Turning to Count III, the committee determined that respondent violated Rules 1.1, 1.3, and 1.4 in his representation of Mrs. Collins. Respondent failed to properly date the will and failed to advise Mrs. Collins to seek other counsel to determine what courses of action were available to her. Furthermore, respondent failed to advise Mrs. Collins of the possibility that she could file a civil action against him. Instead, respondent attempted to probate an invalid will, failed to diligently proceed with Mrs. Collins' case, and failed to find any way to protect her interest or assert any rights she may have had in the matter.
In considering the issue of an appropriate sanction, the committee found that respondent violated duties owed to his client and as a professional, and caused serious harm to a client and to the profession. Respondent's actions were negligent in the Collins matter, but knowing and intentional with respect to Mr. Matthews. The ABA's Standards for Imposing Lawyer Sanctions suggest that the baseline sanction for this conduct is a suspension from the practice of law.
The committee found the following aggravating factors are present in this case: pattern of misconduct; vulnerability of the victim, Mrs. Collins; and substantial experience in the practice of law (admitted 1976). In mitigation, the committee recognized the absence of a prior disciplinary record and remorse.
Under these circumstances, the committee recommended that respondent be suspended from the practice of law for one year and one day, with all but 120 days deferred, followed by a two-year period of probation subject to specified conditions.
The ODC filed an objection to the leniency of the sanction recommended by the hearing committee.

Disciplinary Board Recommendation
The disciplinary board adopted the hearing committee's factual findings and application of the Rules of Professional Conduct. In Counts I and II, the board determined the record demonstrated that Mr. Matthews was meeting with clients, corresponding with counsel and adjusters, handling fees, engaging in discovery, and negotiating settlements. The board noted that these acts, under certain circumstances and with proper supervision, may be properly delegated to non-lawyers. However, it found the evidence in the instant matter revealed that Mr. Matthews was not supervised and that his actions in handling the Logan Farms dispute and the Ihsan settlement amounted to the practice of law. In support, it noted Mr. Matthews discussed legal issues with Mr. Caffey and Ms. Chaffers, both of whom were under the impression that Mr. Matthews is a lawyer, and respondent did nothing to correct this mistaken impression. The board observed that when a supervising lawyer abdicates his responsibility to such an extent that clients, counsel, and adjusters believe that they are dealing with a lawyer and inadequate measures are taken by the supervising attorney to correct the conduct and the false impressions, then the supervising lawyer has failed in his ethical obligations under Rules 5.3 and 5.5(b). Furthermore, respondent allowed Mr. Matthews to sign his name as notary, thereby enabling a disbarred lawyer to do that which he was specifically prohibited to do. The improperly notarized pleading was filed into a public record. The board concluded that such conduct violated Rule 8.4(d).
In Count III, the board noted respondent's stipulation that he allowed Mrs. Collins' *244 legal matter to fall through the cracks. Respondent also admitted that he made a mistake when he failed to properly date the statutory will. Following Mrs. Collins' complaint, respondent assured the ODC that he would take action in the matter, but he failed to follow through. As of the date of the hearing, Mrs. Collins was still unsure whether respondent was representing her, nor did she know where her case stood, what her rights were, and what she could and should do. The board concluded these facts support a determination that respondent failed to act with diligence and competence and failed to adequately communicate with his client, in violation of Rules 1.1, 1.3, and 1.4.
The board found that respondent violated duties owed to his clients, to the legal system, and as a professional. It noted respondent's conduct in the Collins matter was negligent and caused actual harm to Mrs. Collins, while his conduct with respect to Mr. Matthews was knowing or intentional, and caused serious harm to a client, the public, or the profession. Considering all the facts and circumstances of this case, the board determined that a lengthy suspension is the appropriate baseline sanction.
In mitigation, the board emphasized respondent's lack of a prior disciplinary record since his admission in 1976 and his remorse. It also recognized his lack of a dishonest or selfish motive.
Considering these factors, the board recommended that respondent be suspended from the practice of law for three years, with all but one year and one day deferred. The board further recommended that respondent be assessed with all costs and expenses of these proceedings.
Both respondent and the ODC filed objections to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992). Nonetheless, in cases involving credibility evaluations, we generally defer to the factual findings of the hearing committee members who act as the eyes and ears of this court. In re: Bolton, 02-0257 (La.6/21/02), 820 So.2d 548.
In Counts I and II, the record supports the conclusion that respondent violated the professional rules by failing to exercise sufficient supervisory oversight of Mr. Matthews. Respondent's obligations concerning his non-lawyer assistant are set forth in Rule 5.3, which directs the supervising attorney to determine that the non-lawyer's "conduct is compatible with the professional obligations of the lawyer," and Rule 5.5(b), which prohibits the lawyer from assisting a person who is not a member of the bar in any activity which constitutes the unauthorized practice of law.[7] *245 These rules recognize that lawyers generally employ non-lawyers in their practice, including secretaries, investigators, clerks, and paralegals, and that such individuals assist the lawyer in the efficient rendition of the lawyer's professional services. See Comments to ABA Model Rule 5.3. However, a lawyer is completely responsible for the work product of his non-lawyer assistants and must give the assistants appropriate instruction and supervision concerning the ethical aspects of their employment. Id. While appropriate delegation of tasks to non-lawyer assistants is allowed and encouraged, a lawyer may never permit non-lawyer assistants to engage in activities that constitute the practice of law or to hold themselves out as lawyers.[8] Charles W. Wolfram, Modern Legal Ethics 892-95 (1986). The key to appropriate delegation is proper supervision by the lawyer, which includes adequate instruction when assigning projects, monitoring of the progress of the project, and review of the completed project. It is the lawyer's responsibility to see that his non-lawyer employees understand these limitations.[9]
Applying these principles to the instant matter, there is little doubt that respondent failed to adequately supervise Mr. Matthews. The record demonstrates that respondent gave Mr. Matthews a free hand to meet with clients, handle legal fees, correspond with attorneys and insurance adjusters, render legal opinions, and negotiate settlements.[10] Unquestionably, the evidence in the record in support of Counts I and II proves in a clear and convincing fashion that respondent violated Rules 5.3 and 5.5(b). Furthermore, respondent engaged in conduct prejudicial to the administration of justice when he permitted a legal pleading to be "notarized" with his "signature" by Mr. Matthews, then filed into the public record.
Turning to Count III, the hearing committee made a factual finding that Mrs. Collins was credible when she testified she had difficulties in communicating with respondent and in determining the status of the legal matter involving her husband's will. This credibility determination by the committee is not manifestly erroneous. Through this testimony, we conclude the ODC proved by clear and convincing evidence that respondent failed to act with competence and diligence, failed to diligently proceed with Mrs. Collins' case, and failed to adequately communicate with Mrs. Collins, in violation of Rules 1.1(a), 1.3, and 1.4 of the Rules of Professional Conduct.
*246 Having found professional misconduct, we now turn to a discussion of an appropriate sanction. In considering that issue, we are mindful that the purpose of disciplinary proceedings is not primarily to punish the lawyer, but rather to maintain the appropriate standards of professional conduct, to preserve the integrity of the legal profession, and to deter other lawyers from engaging in violations of the standards of the profession. In re: Vaughan, 00-1892 (La.10/27/00), 772 So.2d 87; In re: Lain, 00-0148 (La.5/26/00), 760 So.2d 1152; Louisiana State Bar Ass'n v. Levy, 400 So.2d 1355 (La.1981). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. In re: Redd, 95-1472 (La.9/15/95), 660 So.2d 839; Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984).
Respondent's failure to supervise Mr. Matthews, which forms the basis for Counts I and II, is serious misconduct. Respondent disregarded the stringent rules of this court designed to protect the public from receiving legal advice from persons not authorized to provide such assistance. The prior jurisprudence of this court makes it clear the baseline sanction for this misconduct is disbarment. In re: Sledge, 03-1148 (La.10/21/03), 859 So.2d 671; In re: Brown, 01-2863 (La.3/22/02), 813 So.2d 325; Louisiana State Bar Ass'n v. Edwins, 540 So.2d 294, 303 (La.1989).
In Count III, respondent's actions were negligent at the outset, but became knowing when he failed to follow through on his promise to take action in response to Mrs. Collins' complaint to the ODC. The baseline sanction for this violation is a suspension from the practice of law.
Although we find respondent's misconduct amounts to a serious ethical lapse, we note that an examination of the record reveals the presence of several significant mitigating factors. Respondent has no prior disciplinary record during the nearly thirty years since his admission to the bar in 1976. He has made full and free disclosure to the disciplinary board, exhibited a cooperative attitude toward the proceedings, demonstrated remorse for his actions, and made restitution to Mrs. Collins.[11] Most significantly, his actions in this matter were not the product of a dishonest or selfish motive.
Considering all the unique facts of this case, we conclude the appropriate sanction for respondent's misconduct is a suspension from the practice of law for a period *247 of three years. In light of the significant mitigating factors, we will defer all but one year and one day of this suspension. We caution respondent that any future misconduct may be grounds for making the deferred portion of the suspension executory or imposing additional discipline, as appropriate.

DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that John B. Comish, Louisiana Bar Roll number 4392, be suspended from the practice of law in Louisiana for a period of three years. It is further ordered that all but one year and one day of the suspension shall be deferred, subject to the condition that any future misconduct may be grounds for making the deferred portion of the suspension executory or imposing additional discipline, as appropriate. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
NOTES
[1] In criminal proceedings (at which time he was represented by respondent), Mr. Matthews entered a guilty plea to five counts of forgery and five counts of theft. See State v. Matthews, 572 So.2d 250 (La.App. 1st Cir.1990), writ denied, 575 So.2d 387 (La.1991). Following his plea, Mr. Matthews filed a petition for consent disbarment, which we granted. Louisiana State Bar Ass'n v. Matthews, 532 So.2d 105 (La.1988). Mr. Matthews has never sought readmission and has remained disbarred since 1988.
[2] Logan Farms received this information from Steven White, who was apparently under the impression that Mr. Matthews was an attorney.
[3] The record reflects that respondent was frequently absent from his office during the period of time in which he employed Mr. Matthews. According to witnesses, respondent was having family problems and he took vacation trips to go scuba diving on a fairly regular basis.
[4] Mr. Matthews testified in a sworn statement that these funds were a "bonus" from respondent. Respondent testified that the funds were loaned to Mr. Matthews. Both Mr. Matthews and respondent testified that the funds were repaid.
[5] Mr. Matthews testified at the hearing that he could not recall whether he had or had not received specific instructions from respondent that he was to designate himself as a paralegal on all correspondence that he sent. By contrast, in his sworn statement, Mr. Matthews said that respondent had not specifically told him that he was to designate himself as a paralegal on all correspondence that he sent.
[6] As a disbarred attorney, Mr. Matthews is prohibited by law from exercising notarial functions. See La. R.S. 35:14, which provides in pertinent part as follows:

Any attorney at law, or person who was an attorney at law, who is disbarred or suspended from the practice of law due to charges filed by the Committee on Professional Responsibility of the Louisiana State Bar Association or who has consented to disbarment shall not be qualified or eligible nor shall he exercise any functions as a notary public in any parish of the state of Louisiana as long as he remains disbarred or suspended from the practice of law in Louisiana....
[7] The great potential for harm which results whenever a disbarred attorney is hired as a legal assistant caused us to amend Rule 5.5(c) of the Rules of Professional Conduct to prohibit the employment of a disbarred attorney in a legal capacity during the period of disbarment. Our order amending the rule was effective July 1, 2002 and "shall apply to all lawyers who are ... disbarred by any Order, Judgment, or Decree of the Court which becomes final after the effective date." Because Mr. Matthews was disbarred prior to the amendment, the prohibition does not apply in this case.
[8] There are some matters that must be handled personally by the lawyer and which may never be delegated to a non-lawyer assistant. By way of example and not of limitation, a lawyer may not delegate to a legal assistant or other non-lawyer responsibility for establishing the attorney-client relationship, for establishing the amount of a fee to be charged for a legal service, or for a legal opinion rendered to a client. See also Rule 5.5 of the Louisiana Rules of Professional Conduct, which delineates some specific tasks which this court considers to constitute the "practice of law."
[9] To clarify the ethical obligations of lawyers in the supervision of non-lawyers, in 1991 the ABA Standing Committee on Paralegals adopted the ABA Model Guidelines for the Utilization of Paralegal Services. The guidelines were revised in 2003 and provide lawyers with thorough, useful, and authoritative guidance in working with paralegals and other non-lawyer legal assistants.
[10] During oral argument before this court, respondent's counsel suggested that respondent's supervision of Mr. Matthews was adequate because respondent was "available" by telephone during his absences from the office. However, "availability" is not the same as "supervision."
[11] The ODC argued in brief that restitution to Mrs. Collins should not be considered as a mitigating factor because it was paid at her urging after the complaint was filed. However, the commentary on Standard 9.4 of the ABA's Standards for Imposing Lawyer Sanctions provides that restitution should be considered in mitigation, even if it is made after a complaint is filed, so long as it is made before formal disciplinary proceedings are instituted:

Lawyers who make restitution voluntarily and on their own initiative demonstrate both a recognition of their ethical violation and their responsibility to the injured client or other party. Such conduct should be considered as mitigation ... even if the restitution is made in response to a complaint filed with the disciplinary agency. Lawyers who make restitution only after a disciplinary proceeding has been instituted against them, however, cannot be regarded as acting out of a sense of responsibility for their misconduct, but, instead, as attempting to circumvent the operation of the disciplinary system. Such conduct should not be considered in mitigation. [emphasis added]
In the instant case, respondent made restitution of the unearned fee to Mrs. Collins in April 2000, while the formal charges were not instituted until August 2002.