| ATTORNEY DISCIPLINARY PROCEEDINGS
 

 PER CURIAM.
 

 This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Richard J. Garrett, an attorney licensed to practice law in Louisiana.
 

 UNDERLYING FACTS
 

 Respondent is a solo practitioner handling primarily plaintiffs personal injury cases. In July 1999, respondent hired Marcia Jordan to work in his office as a legal assistant. At the time he employed Ms. Jordan, respondent knew that she had graduated from law school in 1996 and passed the Louisiana bar examination, but had not been admitted to the practice of law.
 
 [1]
 

 After hiring Ms. Jordan, respondent separated his client’s files into so-called “Garrett files,” those for which he retains primary responsibility, and “Jordan” or “J files,” those for which Ms. Jordan maintains primary day-to-day responsibility. | ¡¿Pursuant to the employment agreement between respondent and Ms. Jordan, her compensation differs depending on whether she is working on a “Garrett file” or a “J file.” The agreement provides:
 

 8. The terms of payment for the services of Jordan for Garrett are as follows:
 

 a. On Garrett’s files where he has chosen to do all of the work to conclusion himself [the “Garrett files”], he may assign hourly work in those files to Jordan. Jordan may bill Garrett for any tasks that he assigns to Jordan in those files and be paid for those tasks at the end of each work week.
 

 b. The tasks assigned by Garrett to Jordan in #8(a) may include preparing drafts of interrogatories,
 
 *334
 
 scheduling recorded statements and performing legal research.
 

 c. Garrett will assign files to Jordan to handle to a conclusion under his supervision.
 

 d. On files which Garrett assigns to Jordan [the “J files”] to perform any of the tasks listed above in # 6,[
 
 2
 
 ] Jordan will provide Garrett with the total number of hours worked each week at the end of each week.
 

 e. On those cases referred to in # 8(c), Jordan will be paid out of Garrett’s net income from the cases referred to in # 8(c) when each such case is negotiated to a final disposition.
 

 f. Garrett will apply up to 1/3 of his net income for each of those eases referred to in # 8(c) against the total number of hours worked to date.
 

 g. Jordan’s hourly rate of pay will be $40 per hour.
 

 Applying these terms to the practices of the parties, for tasks that she is asked to perform on one of the “Garrett files,” Ms. Jordan bills respondent an hourly fee of $40. For example, if Ms. Jordan spends three hours drafting discovery responses for a “Garrett file,” she gives respondent an invoice for $120. For this type of work, Ms. Jordan collects a check at the end of each week, drawn on respondent’s operating | .¡account. The sum paid to Ms. Jordan is attributed to the particular “Garrett file” on which she worked and reduces the amount respondent receives as attorney’s fees when the case ultimately settles.
 

 By contrast, Ms. Jordan is not paid for the work she does on her “J files” until the cases are settled. Ms. Jordan keeps a running tally of the number of hours that she works on “J file” cases. When a “J file” case finally settles, respondent compensates Ms. Jordan for her time by paying her up to one-third of the contingency fee he receives on the case. If the one-third amount is not sufficient to cover all of the hours Ms. Jordan has accumulated, then the remaining hours “roll over” until the next “J file” settles.
 

 Respondent and the ODC stipulated that from 1999 until some time in 2004, the payments made to Ms. Jordan on the “J files” came from respondent’s client trust account. Respondent admitted this practice constituted fee sharing but asserted that his violation was inadvertent. The payments to Ms. Jordan on the “J files” are now made from respondent’s operating account.
 

 DISCIPLINARY PROCEEDINGS
 

 In June 2006, the ODC filed one count of formal charges against respondent, alleging that he facilitated Ms. Jordan’s unauthorized practice of law, in violation of Rule 5.5(a) of the Rules of Professional Conduct, and improperly shared legal fees with a nonlawyer, in violation of Rule 5.4(a).
 

 Respondent answered the formal charges and denied any misconduct. He contended that he maintained ultimate responsibility for all files in his office, regardless of whether the files were designated as “Garrett files” or “J files.”
 
 [3]
 
 ^Respondent contended that Ms. Jordan
 
 *335
 
 had no property interest in the “J files,” did not enter into separate agreements with the clients under her own name, and was limited concerning the activities she was able to perform because she was not a licensed attorney. Respondent also denied that he deferred to Ms. Jordan’s judgment concerning the evaluation of the client’s claims, permitted her to negotiate with insurance adjusters, or authorized her to negotiate personal injury settlements. With regard to Ms. Jordan’s compensation, respondent denied that Ms. Jordan received a contingency fee, asserting that “the value of her services was always measured by the hour. The limitation to one-third of Mr. Garrett’s fee was made merely as a convenience to Mr. Garrett so that he would not incur additional overhead expense.” Respondent continued:
 

 While Mr. Garrett acknowledges that the up-to-one-third of his fee payment to Ms. Jordan upon settlement was made out of his own fee, he also maintains that he was unfortunately ignorant concerning the possibility that he might be creating ethical issues by doing so. When he was made aware that an interpretation of the ethical precepts may preclude him from paying Ms. Jordan on “Jordan files” from the fee he earned, he ceased doing so. She is now paid strictly out of an Operational Account. It is notable that no client was ever prejudiced in this respect, and that Ms. Jordan’s compensation was
 
 always
 
 ultimately measured on an hourly basis on all cases. [Emphasis in original.]
 

 Formal Hearing
 

 Most of the documentary evidence introduced at the hearing was obtained by the ODC in the course of its investigation of Ms. Jordan’s bar admission proceeding. In that matter, the ODC took sworn statements from Ms. Jordan, from respondent, and from respondent’s wife, Anne Garrett, who is the bookkeeper and office manager for her husband’s law firm. These three witnesses also testified at the hearing before the commissioner in Ms. Jordan’s bar admission proceeding. The transcripts of all of the Rsworn statements, and of the hearing before the commissioner, were introduced into evidence at respondent’s formal charge hearing.
 

 Regarding the “J files,” Ms. Jordan testified during her sworn statement that she takes calls from prospective clients (typically individuals who have been involved in an automobile accident) when respondent is unavailable. Ms. Jordan interviews the caller and then prepares a written memo for respondent relating the details of the matter. Respondent reviews the memo and decides whether to accept the case. If he does accept the case, respondent signs a letter of representation which is sent to the insurer and schedules a meeting with the new client to sign the medical release forms and a contingent fee agreement. The client’s file is then assigned to Ms. Jordan and is designated a “J file.” Ms. Jordan testified that of the 250 or so files respondent’s firm opens each year, approximately 90 of these are assigned to her as “J files.”
 

 Ms. Jordan testified that she always works under respondent’s supervision, but she has the primary day-to-day responsibility for handling the “J” files. She orders the accident report, maintains contact with the clients, responds to inquiries from third parties for additional information concerning the case, and does legal research. She drafts correspondence, pleadings, and discovery for respondent to review and sign. Ms. Jordan also participates in the taking of recorded statements
 
 *336
 
 of the client by an insurance adjuster.
 
 [4]
 

 When the client is released from treatment by his medical provider, Ms. Jordan begins the process of drafting the settlement proposal. She obtains the client’s medical reports, wage loss information, and the like, does a quantum study, and then [(¡drafts a settlement demand letter to the insurance company. Ms. Jordan gives the letter with the attached documentation to respondent for his review and signature, then sends it to the insurance adjuster. Respondent and Ms. Jordan frequently disagree when it comes to the quantum analysis; asked whether he defers to Ms. Jordan’s judgment in that regard, respondent agreed that he does.
 
 [5]
 

 Ms. Jordan testified that she generally speaks with the insurance adjuster about the settlement of a client’s case; however, the adjuster always knows that Ms. Jordan is not a lawyer. She explained that respondent establishes a minimum settlement amount for each case and notes that information on the inside of the client’s file. When the adjuster calls to discuss settlement, Ms. Jordan rejects the insurer’s offer if it is below the minimum amount and makes a counteroffer. Ms. Jordan testified that ultimately she will accept “anything over the minimal amount,” but “there is no authority to accept less than that.” Ms. Jordan admitted that respondent has given her the authority to handle the settlement negotiations with the adjuster “so long as the discussion stays within the range of the low and the high,” with the caveat that respondent has to approve the final settlement amount before she can formally accept it on the client’s behalf.
 

 After the case is settled, respondent’s secretary prepares a settlement disbursement statement and gives it to respondent along with the release and the settlement check. Respondent discusses the breakdown of the settlement with the client by phone, then makes an appointment for the client to come into the office to |7meet with Ms. Jordan and sign the settlement documents.
 
 [6]
 
 Ms. Jordan reviews the settlement documents with the client, provides copies of the documents, obtains the client’s endorsement on the settlement check, and then gives the client a postdated check for his share of the settlement.
 

 Regarding Ms. Jordan’s compensation on the “J files,” she offered the following explanation in her March 2005 sworn statement:
 

 ... Mrs. Garrett has a tablet in the front [of the file] and I’ll say, you know, “This week I worked ‘X’ amount of
 
 *337
 
 hours on this, ‘X’ amount of hours on that” and I’ll keep it up in front of the file so that, at the end, once the file settles, I have all these hours that I’ve worked that I’ve not been compensated for. Once the case has settled, then, once — she’s the bookkeeper. She does the disbursement sheets on it. After I’ve put everything through, when she’s sending out checks to the doctors, when she’s sending out checks to whoever, then she’ll take a third of Richard’s fee and apply it to the hours that are owed. Now, I can never say that — it was supposed to work out where, let’s say that, they didn’t owe me that much money, they wouldn’t apply the one-third fee. You know, if the one-third fee was like $500 but they didn’t owe me $500 worth the work, then, she would only pay me what was owed, but that’s never the case. I mean, because I work seven days a week. You know, I’m there all hours of the night so I always have an overage so it, in reality, comes out where each one of the “J” files that I work on, one third of the fee is given to me, which is applied to what work is done. [Emphasis added.]
 

 At the hearing before the commissioner in November 2005, Ms. Jordan gave a slightly different version of the process:
 

 Well, the way it works out is at the end of every week, I have to give Mrs. Garrett an accounting of how many hours I worked on “J” files for that week. So she keeps a catalog in the front of the office that will say, “The week ending November 7th, Marcia has worked 45 hours.” Any time that a “J” file settles, up to one-third of the fee will be attributed to any hours that I’m owed. But it’s not |Rnecessarily the entire one-third fee .... well, that’s theoretically. In reality at this point, the amount of hours that I am owed, it turns out that one-third of the fee of the “J” files will be, essentially, given to me, because I have all these hours that have gone not paid. [Emphasis added.]
 

 Respondent’s testimony was similar:
 

 Q. ... she keeps track of her hours on those, but she does not submit that to you on a weekly basis?
 

 A. Correct.
 

 Q. She’s only going to get paid when that case settles?
 

 A. Correct.
 

 Q. Okay, and if the ease settles, as I understand it, up to a third of whatever fee that you’re entitled to is designated as the funds from which her pay will come?
 

 A. Correct. Well—
 

 Q. And to the extent that her hours exceed one third of the fee, it’s capped at one third?
 

 A. Correct.
 

 Q. Okay. What happens to those extra hours; let’s say she worked an additional hour but didn’t have enough — one third of the fee wasn’t enough to fully compensate her?
 

 A. She gets paid at a later time, out of other cases.
 

 Q. So there is a rolling tally, so to speak?
 

 A. Correct.
 

 Q. All right, so, obviously, in reality, the better the settlement value of the case, the more funds there are to perhaps compensate her for her time?
 

 A. That’s correct. Yes. [Emphasis added.]
 

 |9Witness Testimony
 

 Ms. Jordan, respondent, and Mrs. Garrett testified in person before the hearing committee at the hearing on the formal charges. Respondent confirmed that he
 
 *338
 
 agreed with the testimony of his wife and Ms. Jordan in all respects.
 

 Ms. Jordan largely reiterated her prior testimony regarding her compensation. She noted that the “J files” are “where I actually make my money.” Ms. Jordan testified:
 

 I will hand in — let’s say this week I work 60 hours. Next week I work 40 hours. I hand in the hours. I get paid for those hours that I hand in for being at the office whenever a Jordan file settles. What happens with that, when a Jordan file settled, Mr. Garrett gets his fees. Out of his fee, one-third of his fee would then come to me to cover the hours I worked in the office.
 

 Ms. Jordan conceded this arrangement has been lucrative for her. She testified that in 2004, she made $102,000. In 2005, the year prior to the disciplinary hearing, her compensation rose to $168,000.
 

 Concerning the settlement of the “J files,” Ms. Jordan testified that respondent is responsible for setting “the final number,” which she then puts into a settlement demand letter to the insurance company. Respondent also sets a settlement range for the case and notes that information on the inside of the client’s file. Ms. Jordan testified that if an insurance adjuster calls when respondent is not available, she tells the adjuster that she will relay the settlement offer to respondent. Asked whether she has ever accepted settlement offers that were in the pre-approved range without consulting with respondent, Ms. Jordan replied, “No.”
 

 Notably, this testimony was inconsistent with the testimony Ms. Jordan gave during her bar admission proceeding regarding her authority to negotiate with insurance adjusters, in which she stated that she was authorized to handle settlement | innegotiations independently “so long as the discussion stays within the range of the low and the high.” Questioned about this inconsistency at the hearing, Ms. Jordan retreated from her earlier sworn statements:
 

 A.... I think that the way I described it at that time, it was perceived that I was actually given the authority to negotiate with insurance adjusters without [respondent] knowing what was going on. That would be the only thing I want to clarify.
 

 [[Image here]]
 

 Q.... Maybe you misspoke in that statement?
 

 A. I think that after I read the statement I think that I did not explain that very well.
 

 Q. Okay. So now you’re saying what?
 

 A. Well, now I just want everyone to know Mr. Garrett has to be involved in every step of a settlement proceeding or settlement negotiations with an insurance adjuster.
 

 On cross-examination, Ms. Jordan testified that she is paid on the “J file” system for working in the office, regardless of whether that work is legal work on the file or not. For example, if Ms. Jordan is updating the firm’s library, or going to court to file a pleading, she counts those hours just like she counts the hours that she works on a “J file,” i.e., these hours are accumulated and she is paid when a “J file” settles, up to one-third of the sum respondent receives as his attorney’s fee. Once again, this testimony differed in some respects from the testimony Ms. Jordan gave during her bar admission proceeding, in which she testified that she kept track of her hours and charged them to each particular “J file” on which she worked (the March 2005 sworn statement) or, alternatively, that she kept track of how many hours she worked on “J files”
 
 *339
 
 for a given week (the November 2005 hearing before the commissioner).
 

 |
 
 nHearing Committee Report
 

 With regard to the alleged violation of Rule 5.5(a), the ODC contends that respondent allowed Ms. Jordan to handle personal injury cases and negotiate settlements, thereby facilitating the unauthorized practice of law. Considering the hearing testimony of Ms. Jordan, Mrs. Garrett, and respondent, the hearing committee found that respondent was at all times supervised in her work by respondent and that she essentially acted only as an assistant or paralegal in the handling of the files. Further, and again based upon the hearing testimony, the committee found that Ms. Jordan did not ever present herself as an attorney, either to clients or other parties. Ms. Jordan prepared pleadings and correspondence which were at all times reviewed, and in some instances modified, and signed by respondent. In the hearing testimony, Ms. Jordan stated that she relayed messages regarding settlements but was at no time left to negotiate settlements on her own for any files, including those designated internally as the “J files.” However, the committee noted this testimony conflicted to some degree with Ms. Jordan’s testimony in the bar admission proceeding in which she testified that she discussed “high and low” ranges with respondent, and that she had on occasion settled a case with the adjuster if the offer fell within the range.
 

 In addition, while the issue was not addressed at respondent’s hearing by either party, the committee pointed out Ms. Jordan’s testimony during the bar admission proceeding concerning her attendance at recorded statements. Ms. Jordan testified that she attended probably half of the recorded statements taken of respondent’s clients. If the statement was taken over the telephone, it was only Ms. Jordan and the client in the room, and she did not ask questions or object to questions which she thought were inappropriate or unfair; rather, she would stop the statement to get respondent. The committee noted that in that respect, Ms. Jordan was left to make the determination as to what was objectionable or inappropriate.
 

 112Based on these factual findings, the committee concluded that respondent “made substantial effort to avoid the appearance that Ms. Jordan was acting as an attorney, with his supervision of files and the apparent adherence to the practice that all letters and pleadings were signed by him. However, with regard to the settlement negotiations and the recorded statements of his clients, Mr. Garrett appears to have delegated a great deal of discretion to Ms. Jordan in the handling of the Jordan files in these areas, which should be reserved to licensed attorneys.”
 

 With regard to the alleged violation of Rule 5.4(a), the ODC contends that the compensation arrangement between respondent and Ms. Jordan created a pool of funds for payment of her hourly wages which would constitute fee splitting with a nonlawyer. Considering the hearing testimony of Ms. Jordan, Mrs. Garrett, and respondent, the committee found that with the exception of the preparation of settlement statements, for which Ms. Jordan was paid a flat fee, all other services which she performed for respondent were based upon an hourly rate. All three witnesses were consistent in their hearing testimony, as well as in the sworn statements and in the commissioner’s hearing, as to the description of the distinction between the “J files” and the “Garrett files.” With regard to the “J files,” Ms. Jordan was paid based upon an hourly rate, but the timing of the payments was in conjunction with the resolution of other “J files” and she was paid out of and limited to a one-third portion of
 
 *340
 
 respondent’s fee or net income from those files. Ms. Jordan’s compensation is not dependent upon the success of a particular “J file” and if there is no fee income derived for some reason, she is nevertheless guaranteed eventual payment of her hourly compensation from other “J files.”
 

 Ms. Jordan testified at the commissioner’s hearing that because of the significant number of hours she has generated in the “J file” cases, there is always an overage or running balance that is owed to her. She admitted that the practical effect 113of this is that she is paid one-third of every attorney’s fee generated on a “J file” case, not necessarily because of the work which she performs on that file but because of the running balance and the one-third cap.
 

 Because of the issues which were presented in Ms. Jordan’s bar admission proceeding, Ms. Jordan is now paid her hourly compensation from respondent’s operating account, rather than his client trust account, as had previously occurred.
 

 Based on these factual findings, the committee concluded that notwithstanding respondent’s apparent efforts “to avoid a violation of Rule 5.4(a), the practical effect of the running totals due Ms. Jordan is that, although the funds are not earmarked, the result is a de facto sharing of fees because the cap limits the amount paid to her for the accrued hourly time charges which results in her payment being tied to the fee generated on each Jordan case.”
 

 In reviewing the prior decisions of this court, the committee considered
 
 In re: Cornish,
 
 04-1453 (La.12/13/04), 889 So.2d 236, in which the court explained the supervision which lawyers must exercise over their paralegals and other nonlawyer assistants. In
 
 Cornish,
 
 the court found that the respondent violated the Rules of Professional Conduct by giving his paralegal a free hand to correspond with insurance adjusters and negotiate settlements. However, the committee found
 
 Cornish
 
 is distinguishable from the instant case because it involved much more egregious conduct than respondent’s. In
 
 Cornish,
 
 the insurance adjuster was under the mistaken impression that the paralegal was an attorney, an impression which neither Cornish nor the paralegal did anything to correct. There is no evidence of a similar mistaken identity in this present case; conversely, Ms. Jordan testified that the insurance adjuster knew he was dealing with a paralegal, rather than an attorney. Moreover, in
 
 Cornish,
 
 the “free hand” given to the paralegal also included the authority to meet with clients, handle legal fees, and render legal opinions. While Ms. Jordan actively | Mmet with clients and was praised by respondent as being beneficial to the attorney-client relationship, both parties asserted that she did not discuss fees with clients.
 

 Turning to the case law dealing with an attorney’s delegation of representation at a sworn statement, the committee considered
 
 In re: Williams,
 
 02-2698 (La.4/9/03), 842 So.2d 353. In
 
 Williams,
 
 the court found that the non-attorney engaged in the practice of law by participating in the sworn statements of two clients. Notably, the non-attorney indicated that he was an attorney and advised the clients how to answer questions posed by counsel for the insurance company. In the present matter, Ms. Jordan testified that in a “good many instances” she is the only individual present with the client during the sworn statement. She asserted, however, that she does not ask questions during the process, but simply takes notes. She further stated that she does not object to questions that she deems inappropriate or unfair. The committee found these facts distinguish this matter from
 
 Williams,
 
 in that Ms. Jordan is not holding herself out as an
 
 *341
 
 attorney during the sworn statements. However, Ms. Jordan also testified that if she finds a question inappropriate or unfair, she stops the process to ask respondent his opinion. Referring to her role at the recorded statement, respondent testified that “she is my eyes and ears.” The committee suggested this behavior may be “suspect,” as respondent has essentially delegated to Ms. Jordan the authority to use her judgment to determine whether a question is objectionable, in which case she will find respondent. Conversely, if in Ms. Jordan’s judgment there is no objection, there is no one present to object on behalf of the client.
 

 The committee noted that there does not appear to be a bright-line rule for what constitutes fee sharing. In
 
 In re:
 
 Watley, 01-1775 (La.12/7/01), 802 So.2d 593, the court found the respondents guilty of violating Rule 5.4(a) by entering into a fee sharing contract with a non-attorney. Specifically, the parties created an arrangement whereby the respondents’ law firm agreed to pay a paralegal service 40% of the | ^attorney’s fees earned on personal injury cases and 60% of the fees earned on cases referred by the paralegal service. The court found the agreement to constitute intentional fee sharing, illustrated by the fact that the firm attempted to hide the arrangement through misleading invoices. Although the court found no indication of direct harm to a client, it cautioned that the arrangement had the potential to cause harm “because once non-lawyers were given a financial interest in respondents’ legal fees, there was a possibility they could interfere with respondents’ independent judgment in the case.” The court concluded this potential harm to clients and to the legal profession warranted discipline.
 

 For respondent’s misconduct, but considering that there was no evidence of harm to any of his clients, the committee recommended that he be publicly reprimanded.
 

 Respondent filed a brief with the disciplinary board objecting to the hearing committee’s findings and recommended sanction.
 
 [7]
 
 In its brief to the board, the ODC asserted that the baseline sanction for respondent’s misconduct is disbarment.
 

 Disciplinary Board Recommendation
 

 The disciplinary board found there was no clear and convincing evidence that respondent facilitated Ms. Jordan’s unauthorized practice of law by allowing her to participate in client statements or in settlement negotiations. The only evidence of such comes from the documentary evidence submitted at the hearing as exhibits. As to client statements, the board noted that the ODC did not inquire during its questioning of respondent what involvement Ms. Jordan had in taking recorded statements of his clients. Likewise, no testimony was elicited about whether | ^respondent directed Ms. Jordan to exercise her judgment to determine if insurance adjusters were posing objectionable questions, or whether she ever exercised such judgment and respondent thereafter failed to instruct her not to judge whether questions were objectionable. Additionally, although the burden of proof calls for evidence that is clear and convincing, the board found the record devoid of any specific line of questioning by an insurance adjuster from which it could be ascertained what, if any, professional judgment may have been required. The board also
 
 *342
 
 found no evidence of Ms. Jordan making a judgment call about a client’s statement, which respondent knew or should have known to be a misjudgment, but for which he later failed to rectify the consequences. Accordingly, the board not only found the documented testimony ambiguous as to whether Ms. Jordan was exercising the judgment properly exercised only by a lawyer, but also found that the inquiries posed to Ms. Jordan during the commissioner’s hearing cannot satisfy the need for clear and convincing evidence to impute complicity upon respondent for any transgression(s) by Ms. Jordan. Instead, the board concluded that from all that appears in the record, in many instances when an adjuster wanted to take a client’s recorded statement in person or over the phone, respondent made the professional decision to allow his client to give an unsworn statement to the adjuster outside the presence of a lawyer, with Ms. Jordan present to take notes. Finding this is a permissible exercise of professional judgment under the Rules of Professional Conduct, the board determined the hearing committee “manifestly erred by concluding that Respondent had assisted Ms. Jordan in the unauthorized practice of law.”
 
 [8]
 

 117The board likewise rejected the committee’s finding that respondent assisted Ms. Jordan in the unauthorized practice of law relating to her involvement in settling cases. The board found the committee’s conclusion is based only upon its observation that “ ‘high and low" ranges were discussed between Ms. Jordan and Mr. Garrett” and that Ms. Jordan conveyed acceptance to the adjuster “if the offer fell within the range.” The board commented that when “[vjiewed at an elemental level, these observations cannot support the legal conclusion that Ms. Jordan ‘settled a case.’ Likewise, these observations do not compel the legal conclusion that Respondent failed to meet his ethical obligations as an attorney.” The board found the hearing testimony reflects that respondent maintained a direct relationship with his clients, and that he supervised Ms. Jordan’s involvement in negotiations. Because respondent maintained ultimate control as to what was an acceptable settlement value, and obtained client consent to compromise the case, respondent maintained complete professional responsibility for the end result. The board determined this is consistent with the requirements set forth by the court in
 
 In re: Sledge,
 
 03-1148 (La.10/21/03), 859 So.2d 671,
 
 [9]
 
 and accordingly, found the hearing committee erred as a matter of law in finding that Ms. Jordan’s involvement in settlement negotiations equates to respondent’s failure to meet his ethical obligations.
 

 Turning to the issue of respondent’s pay arrangement with Ms. Jordan, and whether such constituted an impermissible sharing of his fees, the board recounted the testimony reflecting that under the written agreement between the parties, and in practice, respondent was liable for all hours Ms. Jordan worked, even for work that |iswas not directly related to any given case, such as office work. This was so
 
 *343
 
 whether or not respondent and his client recovered on any given case. Under respondent’s written agreement with Ms. Jordan, she was not an employee, but a contractor. Because she was not regarded as an employee, there was apparently no requirement to pay her with the regularity required of an employee. Instead, one effect of the written independent contractor agreement was that Ms. Jordan acquiesced to waiting for some of her compensation until the cases on which she had significantly assisted actually bore fruit.
 

 The board concluded that under these facts, there was not clear and convincing evidence that respondent improperly shared his attorney’s fees with a nonlaw-yer. The board conceded, however, that there were periods of time in which respondent had relatively large numbers of hours for which he owed Ms. Jordan, and that he never became wholly current in paying her for the period of time examined during the hearing. Nevertheless, the board concluded that Ms. Jordan does not share respondent’s risk of loss, because her compensation is not contingent upon any particular case(s). Consequently, respondent is not engaged in fee sharing with Ms. Jordan.
 

 Based on this reasoning, the board recommended that the formal charges against respondent be dismissed.
 

 Three board members dissented, noting that when the “J files” settled, Ms. Jordan was paid one-third of the legal fees directly from respondent’s client trust account. This practice continued until formal charges were instituted. Thereafter, the only change in the arrangement was that Ms. Jordan was paid from respondent’s operating account. The dissenting board members observed that this arrangement “may have started innocently, but it quickly became a fee sharing arrangement as Ms. Jordan took full advantage of the opportunity to devote as much time as necessary toJjcjinsure that she would always be paid one third of the legal fee on as many of the ‘J’ files as possible, because ‘Jordan files are where I actually make my money.’ ” The year before her hearing testimony, Ms. Jordan’s compensation had risen to $168,000. While such sizeable annual earnings by a legal assistant might not prove up a case of fee sharing, the dissenting board members noted that in the context of all the other evidence, “it removes all reasonable doubt in a case subject to a lower standard of proof, i.e., clear and convincing evidence.” Therefore, the board majority erred in finding there was no fee sharing between respondent and Ms. Jordan. Moreover, respondent’s continuation of his fee sharing practices after formal charges were instituted against him underscores that his conduct was knowing and intentional.
 

 The dissenting board members agreed with the ODC that the baseline sanction for respondent’s misconduct is disbarment under the ABA’s
 
 Standards for Imposing Lawyer Sanctions.
 
 However, in view of the mitigating factors present, most notably respondent’s unblemished legal career of 54 years, the dissenting board members would recommend the imposition of a two-year suspension, with all but one year and one day deferred, subject to the condition that “Ms. Jordan’s continued employment and method of payment with Respondent’s firm be addressed in the readmission process.”
 

 The ODC appealed the board’s ruling to this court. We ordered the parties to submit briefs addressing the issue of whether the record supports the disciplinary board’s report. After reviewing the briefs filed by the parties, we ordered the case docketed for oral argument.
 

 
 *344
 
 DISCUSSION
 

 Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. Y, § 5(B). Consequently, we act as triers of fact and conduct an|2nindependent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In
 
 re: Quaid,
 
 94-1316 (La.11/30/94), 646 So.2d 343;
 
 Louisiana State Bar Ass’n v. Boutall,
 
 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings.
 
 See In re: Caulfield,
 
 96-1401 (La.11/25/96), 683 So.2d 714;
 
 In re: Pardue,
 
 93-2865 (La.3/11/94), 633 So.2d 150.
 

 We find the record, taken as a whole, supports the conclusion that respondent facilitated Ms. Jordan’s unauthorized practice of law by allowing her to negotiate personal injury settlements on behalf of his clients and in representing clients during recorded statements taken by insurance companies. In this regard, it is significant to note that Ms. Jordan’s testimony has changed markedly from one proceeding to the next concerning the extent of her participation in these activities. In her most recent hearing testimony, Ms. Jordan indicated that she worked strictly under respondent’s supervision and did not have any independent contact with insurance adjusters. However, a review of Ms. Jordan’s earlier testimony suggests that she clearly testified that she was authorized by respondent to handle settlement negotiations independently so long as she stayed within a pre-determined “high and low” range, and that she frequently participated in the taking of recorded client statements.
 

 In rejecting the hearing committee’s finding that respondent facilitated the unauthorized practice of law, the board concluded that Ms. Jordan’s testimony was “inherently ambiguous” and could not constitute clear and convincing evidence of misconduct. However, the fact that Ms. Jordan has presented several different versions of events does not lead to the conclusion that her testimony may not be considered. Rather, the hearing committee, which was presented with both versions of the testimony, made a factual finding that Ms. Jordan’s earlier testimony in her bar 1^ admission proceeding (in which she admitted to attending recorded statements and settling cases if the offer fell within a range selected by respondent) was more credible. Considering the record as a whole, we cannot say this factual finding is clearly wrong. Moreover, we have previously held that these tasks constitute the practice of law and may not be performed by a nonlawyer.
 
 See Cornish, supra; see also
 
 Rule 5.5 of the Rules of Professional Conduct, which specifically defines the “practice of law” to include “appearing as a representative of the client at a deposition or other discovery matter” and “negotiating or transacting any matter for or on behalf of a client with third parties.” Accordingly, respondent has facilitated the unauthorized practice of law by his assistant, Ms. Jordan, in violation of Rule 5.5(a).
 

 Respondent has also committed misconduct by sharing his legal fees with Ms. Jordan. Ms. Jordan and respondent describe her compensation arrangement as “complex” and “convoluted,” but we find it simple: under their agreement, respondent and Ms. Jordan share a predetermined percentage of his legal fees as compensation for her work on the “J files.” Such an arrangement clearly violates the letter and spirit of Rule 5.4(a) of the Rules
 
 *345
 
 of Professional Conduct, which provides that a lawyer “shall not share legal fees with a nonlawyer” except under limited circumstances not relevant to this case. Furthermore, respondent admitted that he engaged in impermissible fee sharing with Ms. Jordan for a period of at least five years. It is interesting to note that the board’s reasoning rejecting the ODC’s allegation of fee sharing leads to the conclusion that respondent
 
 never
 
 engaged in fee sharing, a fact which is contrary to respondent’s own admission that he did engage in fee sharing until the bar admission proceeding was brought against Ms. Jordan.
 

 Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high 12gstandards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct.
 
 Louisiana State Bar Ass’n v. Reis,
 
 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances.
 
 Louisiana State Bar Ass’n v. Whittington,
 
 459 So.2d 520 (La.1984).
 

 The baseline sanction for the facilitation of the unauthorized practice of law by a nonlawyer is disbarment.
 
 See Sledge, supra; In re: Brown,
 
 01-2863 (La.3/22/02), 813 So.2d 325;
 
 Louisiana State Bar Ass’n v. Edwins,
 
 540 So.2d 294 (La.1989). In cases involving fee sharing with a nonlawyer, we have imposed a suspension of one year and one day.
 
 In re: Watley,
 
 01-1775 (La.12/7/01), 802 So.2d 593. For respondent’s misconduct involving both facilitation of the unauthorized practice of law and fee sharing, the overall baseline sanction is disbarment.
 

 As aggravating factors, we recognize a pattern of misconduct, refusal to acknowledge the wrongful nature of the conduct, and substantial experience in the practice of law. In mitigation, we find respondent has no prior disciplinary record.
 

 Having considered these factors in light of the record in its entirety, we decline to deviate from the baseline sanction of disbarment. As Ms. Jordan has become more proficient in the practice of law, respondent has abdicated his responsibilities to his clients. We observed in
 
 Sledge
 
 that such conduct falls far below that expected of lawyers in this state and is an affront to those lawyers who strive to provide competent and ethical representation to their clients. Therefore, respondent must be disbarred.
 

 laJDECREE
 

 Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Richard J. Garrett, Louisiana Bar Roll number 5946, be and he hereby is disbarred. His name shall be stricken from the roll of attorneys and his license to practice law in the State of Louisiana shall be revoked. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
 

 [1]
 

 . In 1999, we denied Ms. Jordan's application for admission to the bar, finding she had not satisfied her burden of proving her good moral character.
 
 In re: Jordan,
 
 97-1564 (La.2/12/99), 730 So.2d 873
 
 ("Jordan J
 
 ”). In 2000, Ms. Jordan filed a second application for admission, which we denied because she made no showing of facts relating to her character and fitness to practice law that changed after the denial of her application in
 
 Jordan I. In re: Jordan,
 
 00-3006 (La. 12/15/00), 775 So.2d 1065
 
 {‘‘Jordan II").
 
 In 2004, Ms. Jordan filed a third application for admission
 
 {"Jordan II
 
 ”). Finding she had demonstrated a change in circumstances, we appointed a commissioner to take evidence in the matter. The commissioner ultimately recommended to this court that the application be denied because Ms. Jordan had engaged in the unauthorized practice of law while employed by respondent and participated in a fee-sharing arrangement prohibited by the Rules of Professional Conduct. We held the commissioner’s recommendation under advisement awaiting the outcome of the instant proceeding. In a separate opinion rendered this day in
 
 In re: Jordan,
 
 04-0542 (La.5/5/09), 12 So.3d 346, 2009 WL 1385932, we now deny Ms. Jordan’s application for admission to the practice of law.
 

 [2]
 

 . These tasks include, for example, meeting with clients, preparing drafts of letters, ordering copies of police reports and medical records, setting up doctor's appointments, preparing settlement packages, "relaying] settlement figure counter-offers to an adjuster with Garrett's permission," preparing discovery, performing legal research, and the like,
 

 [3]
 

 . Respondent suggested the division of the fíles was “merely a convenience."
 

 [4]
 

 . Ms. Jordan stated that she sits with the client and takes notes during these statements but does not ask any questions or make objections. During her sworn statement, Ms. Jordan testified that respondent is generally
 
 not
 
 present at the time the client statement is taken, and in fact, he may not even be in the office. However, Ms. Jordan retreated from this testimony at the hearing before the commissioner, during which she claimed that she never does client statements if respondent is
 
 not in the
 
 office.
 

 [5]
 

 . During the character and fitness hearing, Mrs. Garrett commented that Ms. Jordan and respondent are “very competitive" with each other. Asked what Mrs. Garrett might have meant by her comment, Ms. Jordan explained that she is better at evaluating the worth of a case than is respondent, whom she believes "low balls” settlement demands. Ms. Jordan proudly testified that she usually obtains better settlements on the "J files” than respondent does on the "Garrett files.”
 

 [6]
 

 .Mrs. Garrett explained that Ms. Jordan processes all client settlements (for which she is paid a separate flat fee of $50 each) because she is very good at making sure that the clients don’t talk respondent into reducing his attorney's fees. Mrs. Garrett described her husband as a "pussycat" in that regard.
 

 [7]
 

 . Respondent subsequently withdrew his objection to the public reprimand recommended by the hearing committee.
 

 [8]
 

 . The board expressly noted that this finding does not imply that it had reached any conclusion as to whether Ms. Jordan herself has any culpability for her actions, as that issue is not before the board.
 

 [9]
 

 .
 
 Sledge
 
 involved an attorney whose nonlaw-yer employees were involved in negotiating settlements for clients. While the court did not draw a bright line limiting the extent of nonlawyer involvement, the court did articulate minimum factors which must be present for the attorney's delegation of responsibility to the nonlawyer to be proper: maintaining a direct relationship with the client, supervising the delegated work, and having complete professional responsibility for the work product.